IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

ARTESIAN WATER COMPANY, INC.     :     CIVIL ACTION
                                 :
                    v.           :
                                 :
CHESTER WATER AUTHORITY          :     No. 10-7453

**MEMORANDUM**

**Padova, J.**                                         **July 24, 2012**

This is a contract action arising from the Interconnection Agreement and Addendum (collectively the "Agreement"), pursuant to which the Chester Water Authority ("CWA") supplies water to the Artesian Water Company, Inc. ("Artesian"). Artesian alleges that CWA breached the Agreement by failing to calculate rate increases in 2008, 2009, and 2010 in accordance with Modified § 2.10 of the Addendum. Presently before the Court is CWA's Motion seeking partial summary judgment asking the Court to determine, as a matter of law, the meaning of a term contained in Modified § 2.10. For the following reasons, the Motion is denied.

I.     **BACKGROUND**

CWA is a public, non-profit municipal water company that serves Delaware and Chester Counties. (CWA Ex. 4 at 3.) Artesian is an investor-owned public water utility that provides water to customers in Delaware and is regulated by the Delaware Public Service Commission. (CWA Ex. 6 at 4, 10, Interconnection Agreement at 1.) CWA supplies water to Artesian through a dedicated water interconnection. (See Interconnection Agreement at 1-2.) The parties entered into the Interconnection Agreement on June 6, 1990. (Id. at 1.) The Interconnection Agreement provided that CWA would provide water to Artesian through December 3, 2002, but did not specify the manner in which CWA was to calculate the rates it charged Artesian for the water it provided. (See

id. §§ 2.10, 2.14.)   The Interconnection Agreement was amended on August 1, 1997, by the Addendum.  (See Addendum.)  The Addendum extended the Agreement until December 31, 2021, with an option to further extend the Agreement until December 31, 2047.  (Id. Modified § 2.2.)  The Addendum also added language concerning the manner in which CWA is to calculate the rates it charges Artesian.  (Id. Modified § 2.10.)

CWA's board retains a consultant to study its rates every three years.  (Tonge Dep. at 15-16.) In 2007, CWA's board retained Gannett Fleming, Inc. to perform that year's rate study (the "2007 Rate Study").  (Id. at 16.)  In the 2007 Rate Study, Gannett Fleming recommended that CWA raise its rates for the provision of water in 2008, 2009 and 2010 in order to raise its annual revenues by approximately 25.5%.  (2007 Rate Study at CWA 144.)  CWA's board approved and adopted the rate increases recommended in the 2007 Rate Study.  (Tonge Dep. at 26-27.)

Artesian contends in the Complaint that the rate increases adopted by CWA based on the 2007 Rate Study allowed CWA to overcharge Artesian and collect more than $700,000 from Artesian than it should have collected.  (Compl. ¶ 25.)  The Complaint specifically  alleges that CWA breached the Agreement by failing to calculate rate increases in 2008, 2009, and 2010 in accordance with Modified § 2.10 of the Addendum.  (Compl. ¶ 29.)  Modified § 2.10 states as follows:

> The interconnection meter shall be read on a monthly basis, at a date and time predetermined and agreed to by Chester and Artesian annually, and Chester shall bill Artesian based in accordance with the terms of this Agreement and Chester's then current rates, rules, and regulations.  **The rates charged Artesian for wholesale or bulk water purchases shall be cost-based and shall rely on a cost-of-service analysis using utility-basis of rate-making which conforms with water industry practice and standards.**  Chester's rates and rate structure shall fairly allocate Chester's cost of service and shall

2

> not result in Artesian subsidizing the cost of operating Chester's
> system to the benefit of any class of customers, except as may be
> permitted in applying water industry cost-of-service standards.

(Addendum, Modified § 2.10 (emphasis added).)  The Complaint further alleges that CWA's rate

increases were not cost-based as required by Modified § 2.10.  (Compl. ¶ 15.)

CWA has asserted counterclaims against Artesian, alleging that Artesian has failed to

purchase the minimum quantities of water it is required to purchase under the Agreement and has

failed to pay all amounts it owes CWA under the Agreement.  (Am. Answer & Countercl. ¶¶ 53-54,

59-61.)  CWA initially moved for summary judgment on all claims in the Complaint and on its

Counterclaims.  However, CWA amended its motion in its Reply Brief and now moves for partial

summary judgment only with respect to the meaning of the term "cost-based" as that term is used

in Modified § 2.10.  (CWA Reply Br. at 1.)

## II.   LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as

to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

An issue is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the

nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A factual dispute

is "material" if it "might affect the outcome of the suit under the governing law." Id.

"[A] party seeking summary judgment always bears the initial responsibility of informing the

district court of the basis for its motion, and identifying those portions of [the record] which it

believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477

U.S. 317, 323 (1986).  Where the nonmoving party bears the burden of proof on a particular issue

at trial, the movant's initial Celotex burden can be met simply by "pointing out to the district court"

3

that "there is an absence of evidence to support the nonmoving party's case." Id. at 325. After the moving party has met its initial burden, the adverse party's response "must support the assertion [that a fact is genuinely disputed] by: (A) citing to particular parts of materials in the record . . . ; or (B) showing that the materials [that the moving party has] cited do not establish the absence . . . of a genuine dispute . . . ." Fed. R. Civ. P. 56(c)(1). Summary judgment is appropriate if the nonmoving party fails to respond with a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.

## III.   DISCUSSION

CWA asks that we determine the meaning of the term "cost-based" as it is used in Modified § 2.10 as a matter of law. Both CWA and Artesian agree that the term "cost-based" as it is used in the water utility industry refers to two different methods of calculating a water utility's revenue requirement, the "utility-basis" approach and the "cash-needs" approach. (CWA's Opening Br. at 14-15; Artesian's Mem. at 14-15; 12/15/11 Hr'g Tr. at 4-5, 15.) The most significant difference between the approaches is that a water utility may include depreciation expenses when it calculates its revenue requirements using the utility-basis approach, but may not include depreciation expenses when it uses the cash-needs approach. American Water Works Association ("AWWA") Manual of Water Supply Practices, M-1, Principles of Water Rates, Fees, and Charges, 5th ed. (the "M-1 Manual") at 5-6.[1]

---

[1] Both parties heavily rely on the fifth edition of the M-1 Manual, which was published in 2000, as describing water utility practices and the trade usage of many terms found in Modified § 2.10 as of the time Modified § 2.10 was written, in 1997. (See CWA Opening Br. at 14-16, 22-25; Artesian Mem. at 12-13, 23-25; CWA Reply Br. at 9.) CWA has notified the Court that the AWWA published the sixth edition of the M-1 Manual in June of this year. The sixth edition includes revised

CWA contends that, since the term "cost-based" in Modified § 2.10 could mean either the "utility-basis" approach or the "cash-needs" approach, the Addendum's use of that term allows it to use either approach to determine its revenue requirement for the purpose of determining the rates it charges to Artesian.  CWA states in its Reply Brief that "the only question the Court needs to determine at this stage, as a matter of law, is whether the language of Modified § 2.10 of the Addendum merely **allows** CWA to use the utility-basis approach to determine the revenue requirement, which CWA uses to calculate the rates it charges Artesian."  (CWA Reply Br. at 1.) Artesian, however, maintains that the fact that the term "cost-based" is susceptible of two different meanings compels the conclusion that it is ambiguous as it is used in Modified § 2.10 and its meaning cannot be determined as a matter of law at this stage in the litigation.  (12/15/11 Hr'g Tr. at 15-17.)  Artesian further asserts that it will be able to prove at trial, through parole evidence, that the parties' use of the phrase "cost-based" in Modified § 2.10 requires CWA to calculate its revenue requirement using the "cash-needs" approach. (Id. at 18.)

A.      Interpreting Contract Terms

The United States Court of Appeals for the Third Circuit has explained that, while "Pennsylvania law on contract interpretation and ambiguity is somewhat complicated" it "begins with the 'firmly settled' point that 'the intent of the parties to a written contract is contained in the

---

sections relating to the cash-needs and utility-basis approaches to projecting a water utilities' revenue requirements and includes a new chapter with new material relating to the manner in which municipal water utilities may calculate their revenue requirements with respect to wholesale customers located outside the municipality.  As is discussed in Section III.A., *infra*, the instant Motion requires us to examine the trade usage of the term "cost-based" as of 1997, when the parties entered into the Addendum. Consequently, the manner in which the new M-1 Manuel describes the two cost-based approaches is not relevant to our decision and we will not consider the sixth edition of the M-1 Manual in connection with the instant Motion.  All other references to the M-1 Manual in this Memorandum are, therefore, to the fifth edition.

writing itself.'" <u>Bohler-Uddeholm America, Inc. v. Ellwood Grp., Inc.</u>, 247 F.3d 79, 92 (3d Cir. 2001) (quoting <u>Krizovensky v. Krizovensky</u>, 624 A.2d 638, 642 (Pa. Super. Ct. 1993)).  "'Where the intention of the parties is clear, there is no need to resort to extrinsic aids or evidence,' instead, the meaning of a clear and unequivocal written contract 'must be determined by its contents alone.'" <u>Id.</u> (quoting <u>Steuart v. McChesney</u>, 444 A.2d 659, 661 (Pa. 1982)); <u>see also</u> <u>Weston and Co., Inc. v. Bala Golf Club</u>, 391 F. App'x 152, 155 (3d Cir. 2010) ("'It is firmly settled that the intent of the parties to a written contract is contained in the writing itself.  When the words of a contract are clear and unambiguous, the meaning of the contract is ascertained from the contents alone.'"  (quoting <u>Mace v. Atl. Ref. & Mktg. Corp.</u>, 785 A.2d 491, 496 (Pa. 2001))).  Under Pennsylvania law, a contract term will only be considered ambiguous if

> "it is reasonably or fairly susceptible of different constructions and is capable of being understood in more senses than one and is obscure in meaning through indefiniteness of expression or has a double meaning.  A contract is not ambiguous if the court can determine its meaning without any guide other than a knowledge of the simple facts on which, from the nature of the language in general, its meaning depends; and a contract is not rendered ambiguous by the mere fact that the parties do not agree on the proper construction."

<u>Bohler-Uddeholm</u>, 247 F.3d at 93 (quoting <u>Duquesne Light Co. v. Westinghouse Elec. Corp.</u>, 66 F.3d 604, 614 (3d Cir. 1995).

There are, naturally, two exceptions to the firmly settled point that we do not consider extrinsic evidence of the meaning of apparently unambiguous contract terms.  First, extrinsic evidence may be used to determine whether the contract contains a latent ambiguity.  A latent ambiguity in a contract "arises from extraneous or collateral facts which make the meaning of a written agreement uncertain although the language thereof, on its face, appears clear and

unambiguous.'" Id. (quoting Duquesne Light, 66 F.3d at 614. "A party may use extrinsic evidence to support its claim of latent ambiguity, but this evidence must show that some specific term or terms in the contract are ambiguous; it cannot simply show that the parties intended something different that was not incorporated into the contract." Id. The court may consider the parties' proffered extrinsic evidence if it concerns their "objectively manifested 'linguistic reference' regarding the terms of the contract" rather than their expectations at the time they entered into the contract. Id. at 94 n.3 (quoting Duquesne Light, 66 F.3d at 614).

Second, we may also consider extrinsic evidence of a term's recognized trade usage, whether or not that term is ambiguous, where the term is used in a commercial contract:

> [i]n the law of contracts, custom in the industry or usage in the trade is always relevant and admissible in construing commercial contracts and does not depend on any obvious ambiguity in the words of the contract. If words have a special meaning or usage in a particular industry, then members of that industry are presumed to use the words in that special way, whatever the words mean in common usage and regardless of whether there appears to be any ambiguity in the words. . . . "[I]n the absence of an express provision to the contrary, custom or usage, once established, is considered a part of a contract and binding on the parties though not mentioned therein, the presumption being that they knew of and contracted with reference to it."

Sunbeam Corp. v. Liberty Mut. Ins. Co., 781 A.2d 1189, 1193 (Pa. 2001) (quoting Resolution Trust Corp. v. Urban Redev. Auth., 638 A.2d 972, 976 (Pa. 1994)). Trade usage has been defined to mean "'having such regularity of observance in a place, vocation or trade as to justify an expectation that it will be observed with respect to [a particular agreement]." Nationwide Life Ins. Co. v. Commonwealth Land Title Ins. Co., Civ. A. No. 05-281, 2011 WL 204619, at *8 (E.D. Pa. Jan. 20, 2011) (alteration in original) (quoting Restatement (Second) of Contracts § 222(1), and citing 13 Pa.

Cons. Stat. § 1303(c)).  The parties agree that the term "cost-based" has trade usage in the water industry.  (See CWA Opening Br. at 23 (referring to "'cost-based' [as] a specialized term in the utility industry"); 12/15/11 Hr'g Tr. at 15 (stating the meaning of "cost-based" in the water utility industry).  The Third Circuit has recognized that we may consider the testimony of experts and people in the industry in ascertaining  the trade usage of a particular term.  AstenJohnson, Inc. v. Columbia Cas. Co., 562 F.3d 213, 220-22 (3d Cir. 2009).

If, after we have reviewed the extrinsic evidence of trade usage and any other extrinsic evidence relevant to the existence of a latent ambiguity, such as the parties' courses of conduct, we determine that the meaning of the term "cost-based" is ambiguous as it is used in Modified § 2.10, the next step will be to examine "evidence concerning the pre-contract negotiations of the parties." Id. at 220 (citing Resolution Trust Corp. 638 A.2d at 975-76).  That analysis, however, must be done by the finder of fact after a full factual record has been developed at trial.[2]  See Bohler-Uddeholm, 247 F.3d at 100 (stating that once the district court has determined that an agreement contains ambiguous language, "the proper interpretation of the Agreement [is] an issue for the jury to decide"); see also Emerson Radio Corp. v. Orion Sales, Inc., 253 F.3d 159, 163  (3d Cir. 2001) ("It is hornbook law that if the relevant terms in a contract are ambiguous, the issue must go to a jury." (citing Sanford Inv. Co., Inc. v. Ahlstrom Mach. Holdings, Inc., 198 F.3d 415, 421 (3d Cir. 1999))).

B.    The Extrinsic Evidence

The parties base their arguments regarding the meaning of "cost-based" on extrinsic evidence, specifically the M-1 Manual, expert testimony, testimony of individuals in the water utility industry, and the parties' courses of conduct.

_____

[2]There has been no jury demand in this case.

8

1.      The M-1 Manual

Both of the experts retained by the parties, Scott J. Rubin (CWA's expert) and John F. Guastella (Artesian's expert),  rely on the M-1 Manual.  (Rubin Dep. at 64; Guastella Rpt. at 2.) The M-1 Manual states that the cash-needs approach and the utility-basis approach are "[t]he two generally accepted and practiced approaches to projecting total revenue requirements of a water utility." (M-1 Manual at 4.)  The M-1 Manual explains, in detail, the elements of each approach, the circumstances in which each approach is ordinarily used,  and the differences between the approaches.

The M-1 Manual states that the cash-needs approach is generally used by "government-owned utilities (except in the few jurisdictions where regulation requires the use of the utility approach)." (Id. at 5.)  The M-1 Manual explains that "[c]ash needs refer to the total revenues required by the utility to meet its cash expenditures." (Id.)  The M-1 Manual further states that the components of the cash-needs approach to determining a utility's revenue requirement include "O&M expenses, debt-service payments, contributions to specified reserves, and the cost of capital expenditures that are not debt-financed or contributed.  Depreciation expense is not included." (Id.) "The debt-service component of the cash-needs approach usually consists of principal and interest payments on bonds or other debt instruments." (Id.)

The M-1 Manual states that the utility-basis approach "is mandated for all investor-owned water utilities and mandated or permitted for government-owned utilities in jurisdictions where the utility is regulated by a utility commission or other regulatory body." (Id. at 6.)  The M-1 Manual explains that the term "utility basis" has "two meanings in water utility rate making." (Id.) "One use involves measuring revenue requirements of a utility without concern for allocating those

9

revenue requirements among classes of customers served." (Id.) "The second use of the term . . .
is in allocating revenue requirements, or total costs of service to be derived from water rates, among
the classes of customers served."[3] (Id.) The M-1 Manual further states that "[u]tility-based revenue
requirements may consist of O&M expenses, depreciation expense, return on rate base, and taxes
or other payments to the municipality's general fund." (Id.)

The M-1 Manual further explains that, for a government owned utility, the difference in the
two approaches primarily concerns the treatment of capital-related costs:

> For a government-owned utility, the total level of annual revenue
> required may be similar under either the cash-needs approach or the
> utility approach. The O&M expense component of total revenue
> requirements is usually the same under both approaches. Under the
> utility approach, the annual requirement for capital-related costs
> consists of two components -- depreciation expense and a return on
> rate base. Using the cash-needs approach, capital-related costs are
> recovered through total debt service (principal and interest) and
> coverage.

(Id. at 7.)

CWA is an unregulated government-owned utility (see CWA Reply Br. at 9), and the M-1
Manual states that unregulated government-owned water utilities generally use the cash-needs
approach. (M-1 Manual at 5.) However, it also states that unregulated government owned utilities
are permitted to differentiate between classes of customers and use the utility-basis approach rather
than the cash-needs approach with respect to customers located outside of their jurisdiction:

> Many government-owned utilities recognize in their rate structures
> the differences in costs of serving water users located outside the
> corporate limits of the supplying city or jurisdiction compared with
> those located within the corporate limits. A government-owed utility

---

[3]The parties concur that Modified § 2.10 requires CWA to allocate its costs among its
different customers using the utility-basis approach. (Guastella Rebuttal Rpt. at 6; Rubin Rpt. at 6.)

may be considered to be the property of citizens within the city. Customers within the city are owner customers, who must bear the risks and responsibilities of utility ownership. Outside-city customers are non-owner customers and, as such, bear a different responsibility for costs than do owner-customers.

The costs to be borne by outside-city (non-owner) customers are similar to those attributed to the customers (non-owner) of an investor-owned utility. Such costs include O&M expense, depreciation expense, and an appropriate return on the value of property devoted to serving the outside-city customers.

* * *

A government-owned utility, in most cases where not regulated by a state public utility commission, determines its total revenue requirements, or costs of service, on a cash-needs basis. That is, it must develop sufficient revenue to meet cash needs for O&M expense, debt-service requirements, capital expenditures not debt-financed, and possibly other cash requirements as described in chapters 1 through 6 of this manual. Such cash-needs must be met by the utility as a whole. However, when that utility serves outside-city, non-owner customers, it is most appropriate to measure the costs of such service on a utility basis; that is, to assign costs to outside-city customers for O&M expense, depreciation expense, and an appropriate return on the value of property devoted to serving them. The inside-city customers are then responsible for all remaining cash requirements not derived from outside-city customers. . . .

In some instances, as a matter of policy, a government-owned utility might choose to waive the distinction between owner and non-owner customers and consider the utility to be metropolitan in nature. In such a case, differences in costs between owners and non-owners are not recognized in cost allocation and rate making. This generally would require the owner customers to subsidize the non-owner customers to some degree. Such a policy is a choice to be made by the governing body of the utility.

(M-1 Manual at 65-66.)

The M-1 Manual thus describes trade practices which would permit a municipal water utility

that calculates its rates using a cost-based method to use either the cash-needs approach or the utility-

basis approach in different circumstances, depending on whether it is regulated, whether it calculates its revenue requirements differently for wholesale clients located outside of the municipality, and the policy choices made by its governing body.  Viewing the term "cost-based" in Modified § 2.10 in accordance with the trade practices described in the M-1 Manual, we therefore find that the term "cost-based" as it is used in the phrase "[t]he rates charged Artesian . . . shall be cost-based" in Modified § 2.10 is reasonably susceptible of being construed three ways:  (1) that CWA was to use the cash-needs approach to calculate its revenue requirements as to Artesian; (2) that CWA was to use the utility-basis approach to calculate its revenue requirements as to Artesian; and (3) that CWA could use either the cash-needs approach or the utility-basis approach to calculate its revenue requirements as to Artesian.

> 2.    Expert Opinion

The experts, Scott Rubin for CWA and John Guastella for Artesian, disagree about the meaning of the term "cost-based" in Modified § 2.10.  Rubin is of the opinion that the Addendum's use of that term in Modified § 2.10 does not require CWA to use a particular cost-based approach to calculate its revenue requirement and Guastella has opined that the Addendum's use of the term in Modified § 2.10 can only mean that CWA must use the cash-needs approach to calculate its revenue requirement.

Rubin states that the term "cost-based" is a "tautology." (Rubin Dep. at 65.)  He explains that cost-based means "based on cost as opposed to being based on social factors, general rates of inflation, or something else."  (Id.)  He has noted that the utility industry also uses approaches to ratemaking that are not based on costs, such as price-cap regulation, performance-based regulation, incentive regulation, and social regulation.  (Rubin Rebuttal Rpt. at 2.)  He has further stated that

12

"[b]oth the cash-needs approach and the utility-basis approach are methods of establishing cost-based rates." (Id. at 4.) Consequently, the Addendum, by "specifying cost-based rates," only "prohibits CWA from using any type of incentive regulation, performance-based regulation, price caps, or injecting societal factors (such as affordability or conservation inducements) into the rates it charges to Artesian."[4] (Id.) Rubin concludes that "the contract does not state how CWA should set its overall revenue requirement. Instead, it requires the use of the utility-basis approach to allocate costs to Artesian and to set rates for Artesian, with no adjustments to reflect societal goals, social policy, incentives, or performance criteria." (Id. at 5.)

Guastella, however, has testified that Modified § 2.10's use of the term "cost-based" requires CWA to use the cash-needs approach. (Guastella Dep. at 164.) He stated that "[c]ost-based for a municipality is a cash-needs approach. There is no other way to interpret cost-based. So that's exactly what it is saying. There is no other interpretation for it." (Id. at 165.) Guastella has explained that investor-owned utilities, unlike municipal utilities such as CWA, use the utility-basis approach because investor-owned utilities need to provide a return on equity to their stockholders:

> The utility-basis method for investor-owned utilities recognizes depreciation and return on net investment, where the return is based on the weighted cost of capital (the combination of interest on debt and equity return to stockholders), but does not provide an allowance for principal payments on the debt portion. The cash-basis or cost-based method for municipal utilities recognizes principal and interest on debt, but does not allow for depreciation or equity return. This is because depreciation covers the loss in service value of the assets which is roughly equivalent to recovery of principal on debt service, so to include both would be to account twice for the same thing. There is no equity return afforded to municipal utilities for the simple

_____

[4]Rubin has not explained how, as an unregulated municipal utility, CWA could have been subject to price-cap regulation, performance-based regulation, incentive regulation, and social regulation.

reason that there is no equity investment in municipal utilities.

(Guastella Rebuttal Rpt. at 5.)

Guastella has also parsed the language of Modified § 2.10 to explain his conclusion that the parties did not intend their use of the term cost-based to allow CWA to use the utility-basis approach to determine its revenue requirement.  He first explains how his conclusion is driven by the manner in which rates are set in the water utility industry:

> water utility rate setting is a three step process.  The first step is the determination of the revenue requirement or total cost of providing water service.  The second and third steps are the allocation of costs to the customer classes and then the design of rates.  In my opinion it is clear that the phrase in the Addendum that the rates "shall be cost-based" refers to the first step or the revenue requirement, and the phrase "and shall rely on a cost-of service analysis using utility-basis of rate making" refers to the second step or the cost allocation among customer classes.  For municipal utilities, "cost-based" rates represent the methodology of determining revenue requirements -- recovery of operating expenses and debt service.  The "Utility-basis" refers to the cost allocation methodology which allocates operating and maintenance expenses, depreciation and return on investment.

(Guastella Rpt. at 18.)  He then explains that "the Addendum specifies that use of the cost-based method shall be used for the revenue requirement, and the utility-basis for allocating cost.  If the utility-basis had been intended for both the revenue requirement and the cost allocations, the Addendum would have so stated."  (Id.)  He has also testified similarly that, if the parties intended to allow CWA to determine its revenue requirements using the utility basis approach:  "[t]his statement should just read the rates shall be based on a utility-basis without any other mention and without having two separate components." (Guastella Dep. at 159.)

Viewing the term "cost-based" in Modified § 2.10 in accordance with the opinions regarding the meaning of that term provided by the parties' experts, and based upon the trade practices they

14

have described, we find that term "cost-based," as it is used in the phrase "[t]he rates charged Artesian . . . shall be cost-based" in Modified § 2.10 is reasonably susceptible of being construed in two ways:  (1) that CWA could use any cost-based method to calculate its revenue requirements as to Artesian, but could not use a non-cost-based method; and (2) that CWA, as an unregulated, government-owned, municipal utility, could use only the cash-needs approach to calculate its revenue requirements as to Artesian, because it was not subject to regulation and did not need to include a return on equity for shareholders in its revenue requirements.

3.     People in the Industry and the Parties' Courses of Conduct

The parties rely on the testimony of two additional individuals involved in the water utility industry with respect to the meaning of the term "cost-based" and rely on that testimony, as well as certain documents, to establish the parties' course of conduct.  Paul Herbert, president of the valuation and rate division at Gannett Fleming testified as to his understanding of the term "cost-based," the approach Gannett Fleming has used to calculate CWA's revenue requirements as to Artesian since the parties entered into the Agreement, and the parties' drafting of Modified § 2.10. David B. Spacht, Chief Financial Officer for Artesian, also testified as to his understanding of the term "cost-based" and the parties' drafting of Modified § 2.10.

Herbert testified that cost-based revenue requirements can be calculated "under the utility basis or under the cash basis." (Herbert Dep. at 54.)  Herbert, who has worked for Gannett Fleming since the late 1970s, has participated in preparing rate studies for CWA approximately every three years since 1978.  (Id. at 31-32, 35.)  He has been the project manager for each rate study performed for CWA by Gannett Fleming since 1993.  (Id. at 33.)  In each of those studies, since 1993, he has calculated CWA's revenue requirements using the utility-basis approach. (Id. at 34.) Herbert further

testified that the parties' execution of the Addendum did not cause Gannett Fleming to change the methodology it used to calculate CWA's revenue.  (Id. at 56.)  Spacht testified that the cash-needs and utility-basis are both cost-based methods of calculating a utility's revenue requirement, although it is his understanding, based upon water utility manuals, that government-owned utilities generally use the cash-needs approach.  (Spacht Dep. at 24.)

The record also contains the following evidence of the parties' course of conduct with respect to the drafting of Modified § 2.10.  Artesian was notified by its consultant, Camp Dresser & McKee, on December 12, 1996, that a review of CWA's rate study showed that Gannett Fleming had been calculating CWA's revenue requirements using the utility basis approach.  (CWA Ex. 9.)  CWA and Artesian began negotiating the Addendum during the first half of 1997 and CWA sent the first draft of the Addendum to Artesian on May 23, 1997.  (Artesian Ex. 6.)  The first draft of the Addendum did not include Modified § 2.10.  (See id.)  Artesian first added Modified § 2.10 to the Addendum on June 6, 1997.  (Spacht Dep. at 8-9; CWA Ex. 15.)  The version of Modified § 2.10 contained in that draft stated that "[t] rates charged Artesian for wholesale or bulk water purchases shall be cost-based and shall rely on a cost-of-service analysis" but did not mention the "utility-basis of rate making."  (Id. at 3-4.)  That phrase was added to Modified § 2.10 three days later by CWA.  (CWA Ex. 16.)  Herbert participated in drafting that portion of Modified § 2.10.  (Herbert Dep. at 49-51.)

CWA argues that its course of conduct, i.e., continuing to use the utility-basis approach to calculate its revenue requirements as to Artesian after the parties agreed to Modified § 2.10, establishes that Modified § 2.10 must be interpreted to permit it to do so.  However, there is no evidence in the record before us that Artesian was aware that CWA was using the utility-basis approach to calculate its revenue requirements between the time the parties adopted Modified § 2.10

16

and the time it received the 2007 Rate Study.  Indeed, Artesian has, through its counsel, expressly denied  receiving CWA's rate studies after 1996 and prior to the 2007 Rate Study.  (12/15/11 Hr'g Tr. at 23.)

The testimony of Herbert and Spacht and the documentary evidence of the parties' course of conduct establish that Gannett Fleming consistently used the utility-basis approach to calculate CWA's revenue requirements as to Artesian, but does not establish that Artesian was aware that Gannett Fleming was continuing to use the utility-basis approach after the parties agreed to the Addendum and prior to its receipt of the 2007 Rate Study.  The course of conduct evidence further establishes that Artesian sought to include the requirement that the rates charged by Artesian be cost-based in Modified § 2.10 and that CWA sought to include the phrase "using utility-basis of rate making."  We find that there is insufficient evidence of the parties' courses of conduct to support a conclusion, on a motion for summary judgment, that the parties agreed that the term "cost-based" as it is used in the phrase "[t]he rates charged Artesian . . . shall be cost-based" in Modified § 2.10 meant that CWA could use either the cash-needs approach or the utility-basis approach to determine its revenue requirements as to Artesian.

## IV.   CONCLUSION

We have analyzed the meaning of the term "cost-based" as it is used in Modified § 2.10 of the Addendum using extrinsic evidence regarding the parties' "objectively manifested 'linguistic reference' regarding" that term.  See Bohler-Uddeholm, 247 F.3d  at 94 n.3 (quoting Duquesne Light, 66 F.3d at 614).  We have considered the trade usage of that term as it was expressed in the M-1 Manual as well as expert reports and  testimony, and the testimony of individuals in the water utility industry as to the trade usage of that term.  We have also examined the relevant evidence of

17

the parties' courses of conduct to see if that evidence would shed light on the meaning of the term.

We have found that the parties' use of the term "cost-based" could reasonably be found to mean that

CWA was to use the "cash-needs" approach to calculate its revenue requirement as to Artesian; that

CWA was required to use the "utility-basis" approach to calculate its revenue requirement as to

Artesian; or that CWA could use either approach.  We conclude that the term "cost-based" as it is

used in Modified § 2.10, is "reasonably or fairly susceptible of different constructions and is capable

of being understood in more senses than one and is obscure in meaning through indefiniteness of

expression or has a double meaning."  Id. at 93 (quoting Duquesne Light, 66 F.3d at 614).  We

further conclude, accordingly, that the term "cost-based" is ambiguous as it is used in Modified §

2.10 and that its meaning must, therefore, be determined by the finder of fact after a full factual

record has been developed at trial.  See id. at100.  Since there is a genuine issue of material fact as

to the meaning of the term "cost-based" as it is used in Modified § 2.10 of the Addendum, CWA's

Motion for partial summary judgment is denied.  An appropriate order follows.


                              BY THE COURT:

                              /s/ John R. Padova

                              _____

                              John R. Padova, J.