IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ARTESIAN WATER COMPANY, INC. | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| CHESTER WATER AUTHORITY | : | No. 10-7453 |

## MEMORANDUM

**Padova, J.**                                                                                    **September 30, 2014**

This is an action for breach of contract arising from the Interconnection Agreement and Addendum (collectively the "Agreement"), pursuant to which the Chester Water Authority ("CWA") supplies water to the Artesian Water Company, Inc. ("Artesian"). Artesian alleges that CWA breached the Agreement by failing to calculate rate increases in 2008, 2009, and 2010 in accordance with Modified § 2.10 of the Addendum. On October 23, 2012, by agreement of the parties and counsel, and in accordance with Federal Rule of Civil Procedure 53, we appointed Joshua W. Martin, III, Esquire as Special Master to hear all of the claims and counterclaims raised by the parties in this proceeding and to file a Report and Recommendation ("R&R") with respect to those claims and counterclaims. Mr. Martin filed his R&R on October 17, 2013. Presently before the Court are Artesian's Objections to the R&R and CWA's Exceptions to, and Motion to Adopt, the Net Conclusions of the R&R. For the following reasons, we sustain one of Artesian's objections and one of CWA's exceptions and we overrule the remaining objections and exceptions.

## I.       BACKGROUND

CWA is a public, non-profit municipal water company that serves Delaware and Chester Counties. (Joint Stipulated Findings of Fact ("JSFF") ¶ 6 (citation omitted).) Artesian is an investor-owned public water utility that provides water to customers in Delaware and is

regulated by the Delaware Public Service Commission. (Id. ¶¶ 2-4 (citations omitted).) The parties' relationship began in December 1984, when they jointly applied for approval of an interconnection between CWA and Artesian through which CWA would supply Artesian with an average of four million gallons of water per day. (Id. ¶ 26 (citation omitted).) On June 6, 1990, the parties entered into the Interconnection Agreement, which provided that CWA would provide water to Artesian through December 31, 2002, and set forth the minimum quantities of water that Artesian would be required to purchase from CWA each month. (Interconnection Agreement (JX-1), §§ 2.1, 2.3, 2.14.) The Interconnection Agreement also set forth the method CWA would use to bill Artesian for the water it used, but did not specify the manner in which CWA was to calculate the rates it charged Artesian for the water it provided. (Id. § 2.10.)

The parties operated under the terms of the Interconnection Agreement without any problems until 1996. (JSFF ¶ 45.) In September 1996, CWA notified Artesian that it would increase its rates for the water it supplied to Artesian by approximately 19%. (Id. ¶ 46 (citation omitted).) Artesian subsequently asked CWA for a copy of the rate study, prepared by Gannett Fleming (CWA's consultant), on which the rate increase was based. (Id. ¶¶ 47, 50 (citations omitted).) Artesian's consultant, Camp Dresser & McKee ("CDM"), reviewed the 1996 rate study to "ascertain whether the methodology and assumptions used to determine rates . . . is generally consistent with industry standards." (Id. ¶ 49 (internal quotation omitted).) CDM determined that Gannett Fleming "relied on a utility basis to evaluate costs and design rates. However, the resulting revenues were then measured on a cash basis to determine [CWA]'s ability to fund various reserve accounts and meet budgetary obligations." (Id. ¶ 50 (internal quotation omitted).) In December 1996, David B. Spacht, CFO and Treasurer of Artesian, met with Peter Mac Ewan, CWA's then-Executive Manager and Chief Engineer, to discuss the rate

increase.  (Id. ¶ 51 (citation omitted); 1/23/13 N.T. at 114-15.)   After several months of communications regarding the rate increase, the parties began to consider resolving their differences by amending the Interconnection Agreement.  (JSFF ¶¶ 52-56 (citations omitted).)

On August 1, 1997, the parties executed the Addendum, by which they modified certain sections of the Interconnection Agreement.  (Addendum (JX-2).)  Through the Addendum, the parties extended CWA's obligation to provide water to Artesian, and Artesian's obligation to purchase water from CWA, through December 31, 2021.  (Id. Modified § 2.2.)  The Addendum also gives Artesian the right to extend the term of the Agreement through December 31, 2047. (Id.)  The Addendum further modified the minimum amount of water that Artesian is obligated to purchase from CWA each month.  (Id. Modified § 2.3.)  In addition, the parties included language in the Addendum which governs the methodology that CWA uses to calculate the rates it charges Artesian.  (Id. Modified § 2.10.)  Artesian initially proposed the language for what would become Modified § 2.10 of the Addendum in a fax sent by Spacht to Mac Ewen on June 6, 1997:  "[t]he rates charged Artesian for wholesale or bulk water purchases shall be cost-based and shall rely on a cost-of-service analysis which conforms with water industry practice and standards."  (JSFF ¶ 64 (citation omitted).)  On June 9, 1997, Robert Naef responded to Artesian on behalf of CWA, asking that the phrase "using utility-basis of rate making" be inserted in Modified § 2.10 after the term "cost-of-service analysis."   (Id. ¶ 66 (internal quotations omitted).)  The final version of Modified § 2.10 agreed to by the parties states as follows:

> The interconnection meter shall be read on a monthly basis, at a date and time predetermined and agreed to by Chester and Artesian annually, and Chester shall bill Artesian based in accordance with the terms of this Agreement and Chester's then current rates, rules, and regulations.  The rates charged Artesian for wholesale or bulk water purchases shall be cost-based and shall rely on a cost-of-service analysis using utility-basis of rate-making which conforms with water industry practice and standards.  Chester's rates and rate structure shall fairly allocate Chester's cost of service and shall not result in Artesian subsidizing the

cost of operating Chester's system to the benefit of any class of customers, except as may be permitted in applying water industry cost-of-service standards.

(Addendum, Modified § 2.10.)

CWA subsequently increased the rates it charged Artesian based on rate studies performed by Gannett Fleming in 1999, 2002, and 2005. (JSFF ¶¶ 69-86 (citations omitted).) Artesian did not object to any of those rate increases, which were implemented in 2000, 2003, 2005, 2006, and 2007. (Id. ¶¶ 71, 75, 79, 81, 84, 86 (citations omitted).) Gannett Fleming prepared another rate study in 2007, in which it recommended that CWA adopt additional rate increases in 2008, 2009 and 2010. (Id. ¶¶ 88-89 (citations omitted).) CWA's Board of Directors approved those rate increases and raised the rates it charged Artesian for each 1,000 gallons of water purchased from $2.40 to $2.60 in 2008, from $2.60 to $2.83 in 2009, and from $2.83 to $3.11 in 2010. (Id. ¶¶ 93, 101, 109 (citations omitted).)

In May 2009, after it learned about the 2009 rate increase, Artesian retained John Guastella to analyze CWA's rate study and determine if the costs attributed to Artesian were appropriate. (Id. ¶¶ 119-20 (citations omitted).) Around the same time, Artesian asked CWA for a copy of its 2007 Rate Study. (Id. ¶ 121 (citations omitted).) Based on his review of the 2007 Rate Study and CWA's responses to requests for data regarding the 2007 Rate Study, Guastella found that "the methodology used to establish the revenue requirements is not consistent with typical rate setting practices by municipal utilities or with proper rate setting principles." (Id. ¶¶ 123-24 (internal quotation omitted).) Mr. Guastella recommended "that each of the rate increases in 2008, 2009 and 2010 should be rescinded, and that a rate reduction is also appropriate for the level of rates in effect during 2007." (Id. ¶ 124 (internal quotation omitted).) Artesian subsequently informed CWA "that it believed the 2010 rate increase was inappropriate," asked CWA to rescind the 2010 rate increase, and asked CWA to refund the 2008

and 2009 rate increases. (Id. ¶¶ 127, 130 (citations omitted).) On December 22, 2010, Artesian filed the instant lawsuit.

Count I of the Complaint asserts a claim against CWA for breach of contract, alleging that CWA breached the terms of the Agreement "by failing to calculate rate increases in 2008, 2009 and 2010 in accordance with Modified Section 2.10." (Compl. ¶ 29.) Specifically, the Complaint alleges that "CWA relied on budgeted capital expenditure far in excess of the actual expenditures; included contributions in its analysis justifying the rate increases; understated revenues in 2007 and 2008; and sought to establish an unnecessary renewal and replacement fund." (Id. ¶ 29.) Count II of the Complaint asserts a claim for unjust enrichment, alleging that CWA has been unjustly enriched by more than $700,000 it received from Artesian as a result of the 2008 and 2009 rate increases. (Id. ¶¶ 32-33.) Count III of the Complaint seeks a declaratory judgment that "the appropriate rate [Artesian] must pay to CWA for the [water] shall be the rate that was in effect on July 1, 2007 or, in the alternative, a cost-based rate relying on a cost-of-service analysis using utility-basis of rate-making which conforms with water industry practice and standards." (Id. ¶ 41.) Count III also seeks a declaration that:

> when setting any future rate, the rates charged Artesian shall be cost-based and shall rely on a cost-of-service analysis using utility-basis of rate-making which conforms with water industry practice and standards. Additionally, the rates and rate structure imposed on Artesian by CWA shall fairly allocate CWA's costs of service and shall not result in Artesian subsidizing the cost of operating CWA's system to the benefit of any class of customer, except as may be permitted in applying water industry cost-of-service standards.

(Id. ¶ 42.)

CWA has asserted two counterclaims for breach of contract against Artesian. Count I of the Amended Counterclaim asserts that between 2007 and 2010, Artesian breached the Agreement by purchasing less than the minimum amount of water it was obligated to purchase

from CWA pursuant to Modified § 2.3 of the Addendum. (Am. Answer and Counterclaim ¶¶ 52-54.) CWA seeks monetary damages in an amount in excess of $140,000 in connection with this counterclaim. (Id. ¶ 55.) Count I of the Amended Counterclaim also asserts that Artesian breached the Agreement by failing to pay CWA all amounts due and owing, as it submitted payments to CWA for water purchased in 2010 and 2011 that disregarded CWA's rate increases since 2007. (Id. ¶¶ 56-60.) CWA seeks monetary damages in an amount in excess of $ 285,000 in connection with this aspect of its counterclaim. (Id. ¶ 61.) Count II of the Amended Counterclaim seeks a declaration that Artesian has breached the Agreement as described above.

On June 24, 2011, CWA moved for summary judgment on all of Artesian's claims in the Complaint and its Amended Counterclaims. However, CWA amended its motion in its Reply Brief to request that the Court decide only the meaning of the term "cost-based" as that term is used in Modified § 2.10 of the Addendum. We held a Hearing on that Motion on December 15, 2011. We subsequently denied the Motion, concluding that the term "cost-based" is ambiguous as it is used in Modified § 2.10 of the Addendum and that its meaning would have to be determined by the finder of fact after a full factual record had been developed at trial. Artesian Water Co. v. Chester Water Auth., Civ. A. No. 10-7453, 2012 WL 3029689, at *10 (E.D. Pa. July 24, 2012).

In October 2012, we referred the case to the Special Master. He held a trial on January 23-25, 2013, and February 25-27, 2013. He issued a 107-page Report and Recommendation on October 16, 2013.[1] The Special Master made the following Recommendations with respect to the claims of both parties:

---

[1]On March 22, 2013, CWA filed a Motion for Sanctions against Artesian, seeking the imposition of monetary sanctions against both Artesian and its counsel arising from Artesian's alleged failure to correct a misstatement made by its counsel during our December 15, 2011

1. The methodology that Gannett Fleming and CWA used to establish the revenue requirement, and thus the necessary rate increase, for customers in Artesian's class in the 2007 Rate Study does not breach the Addendum. (R&R at 106.)

2. Artesian failed to prove its breach of contract claim in Count I of the Complaint that CWA breached the Addendum by setting Artesian's rates and implementing the 2008, 2009 and 2010 rate increases as recommended by Gannett Fleming in the 2007 Rate Study. (Id.)

3. Artesian's claim for unjust enrichment in Count II of the Complaint must fail because the Addendum is a valid and enforceable contract. (Id.)

4. Artesian is not entitled to the specific declaratory judgment requested in Count III of the Complaint, but would be entitled to a declaration that:

> (a) the appropriate rate under which Artesian will purchase water shall be, as provided in the Addendum, cost-based − *i.e.*, based on either the cash-needs or utility-basis approach − and shall use a cost-of service analysis based on the utility-basis of rate making which conforms with industry practices and standards; and (b) that in setting future rates, CWA must set those rates in accordance with the Addendum as interpreted herein.

(Id.)

5. CWA has proven by a preponderance of the evidence that Artesian breached the Agreement by refusing to pay rates in excess of CWA's 2007 rates from July 1, 2010 to the present. (Id.)

6. Artesian should be ordered to pay CWA for all withheld invoiced amounts for water billed between July 2010 and the present. (Id.) Artesian should also pay CWA late fees on the withheld amounts. (Id.) The total amount of monetary damages accrued by CWA in connection with this claim from July 1, 2010 through the end of 2012, totals $1,741,173.17. (Id.)

---

Hearing. The Special Master also heard the Motion for Sanctions and included it in his Report and Recommendation.

7.     CWA failed to prove by a preponderance of the evidence that Artesian breached the Addendum's minimum purchase provision.  (Id. at 107.)

8.     Judge Padova should grant CWA's request for a declaration that, pursuant to the Addendum, CWA must give Artesian prior written notice 90 days before it passes fees from the Susquehanna River Basin Commission through to Artesian.  (Id.)

9.     CWA's Motion for Sanctions against Artesian and its counsel should be denied. (Id.)

## II.     OBJECTIONS TO THE REPORT AND RECOMMENDATION

The parties have both filed objections to the R&R.  Federal Rule of Civil Procedure 53 provides that we must decide all objections to the Special Master's findings of fact and conclusions of law de novo.  Fed. R. Civ. P. 53(f)(3), (4).

Artesian raises three objections to the R&R.  First, Artesian objects to the Special Master's determination that the Addendum is not void even though the parties disagree about the meaning of the term "cost-based" as that term is used in Modified § 2.10 of the Addendum. Second, Artesian objects to the Special Master's determination that it failed to prove a breach of Modified § 2.10 even though CWA's Board violated industry practices by "rubber stamp[ing]" its 2009 and 2010 rate increases.  Third, Artesian objects to the Special Master's determination that CWA is entitled to damages, including late fees, as a result of Artesian's refusal to pay rates in excess of CWA's 2007 rates from July 1, 2010 to the present.  CWA also asserts three objections (which it refers to as exceptions) to the R&R.  First, CWA objects to the Special Master's rejection of the 11% Return on Equity used by Gannett Fleming in the 2007 Rate Study.  Second, CWA objects to the Special Master's determination that CWA's Board failed to comply with water industry practice and standards in connection with its approval of CWA's

2009 and 2010 rate increases. Third, CWA objects to the Special Master's recommendation that the Motion for Sanctions be denied.

## III. ARTESIAN'S OBJECTIONS

### A. Cost-Based

Artesian contends that the Special Master erred in failing to find that the Addendum is void because the parties did not agree to the meaning of the term "cost-based" as that term is used in Modified § 2.10. According to Artesian, the root of the Special Master's error in this regard is his erroneous finding that the parties agreed to the meaning of that term.

#### 1. The use of the term "cost-based" in Modified § 2.10 of the Addendum

Modified § 2.10 of the Addendum governs the methodology that CWA is required to use to calculate the rates it charges Artesian. Water utilities set their rates using a two-step process. "[T]he first step is to establish the total cost to [the utility] to provide water service to all of its customers. This step is known as the total Revenue Requirement." (JSFF ¶ 17 (citations omitted).) "The second step is to allocate the Revenue Requirement (those costs) among the various customer classes in order to recover those costs. This step is known as the Cost Allocation." (Id. ¶ 18 (citations omitted).)

As we mentioned above, Modified § 2.10 provides that "[t]he rates charged Artesian for wholesale or bulk water purchases shall be cost-based and shall rely on a cost-of-service analysis using utility-basis of rate-making which conforms with water industry practice and standards." (Addendum, Modified § 2.10.) We concluded on summary judgment that the term "cost-based" was ambiguous as it was used in Modified § 2.10 of the Addendum, and we left the determination of the meaning of that term for trial. Artesian Water Co., 2012 WL 3029689, at *10. Consequently, at trial, the Special Master examined the meaning of the term "cost-based"

as it was used in Modified § 2.10 in accordance with Pennsylvania law regarding contract interpretation.[2] (R&R at 30-33.)

1. The Special Master's findings regarding the meaning of cost-based

The Special Master first examined the trade usage of the term. The parties both rely on the fifth edition of the American Water Works Association Manual of Water Supply Practices, M–1, Principles of Water Rates, Fees, and Charges (the "M–1 Manual") as setting forth the water industry practices and standards in effect at the time that they entered into the Addendum.[3] The M-1 Manual states that "[t]he two generally accepted and practiced approaches to projecting total revenue requirements of a water utility are the 'cash-needs' approach and the 'utility' approach." Am. Water Works Ass'n, M-1 Manual at 4 (5th ed. 2000). The parties agree that both the cash-needs and utility-basis approaches are cost-based. (JSFF ¶ 20.) The approaches differ with respect to which capital-related costs are included in the projections. (Id. (citing M-1 Manual at 7).) The M-1 Manual explains that a utility using the cash-needs approach establishes its revenue requirements based on its "O&M expenses, debt-service payments, contributions to specified reserves, and the cost of capital expenditures that are not debt-financed or contributed."

---

[2]Under Pennsylvania law, contract interpretation starts with the intent of the parties as their intent "is contained in the writing itself." Bohler-Uddeholm Am., Inc. v. Ellwood Grp., Inc., 247 F.3d 79, 92 (3d Cir. 2001) (internal quotation omitted). If a contract is ambiguous, the court may consider extrinsic evidence to determine the meaning of the contract. Id. (citation omitted). The court may also consider extrinsic evidence of a term's recognized trade usage, whether or not the term is ambiguous, if the term is used in a commercial contract. Sunbeam Corp. v. Liberty Mut. Ins. Co., 781 A.2d 1189, 1193 (Pa. 2001). Evidence of trade usage includes the testimony of experts and people in the industry. See AstenJohnson, Inc. v. Columbia Cas. Co., 562 F.3d 213, 220-22 (3d Cir. 2009). If, after analyzing the writing itself and the evidence of trade usage, the court concludes that the term is ambiguous, the court may consider the parties' courses of performance and evidence concerning their pre-contract negotiations. Id. at 220 (citation omitted).

[3]The fifth edition of the M-1 Manual was the current edition at the time the parties entered into the Addendum and the parties jointly entered a copy of the fifth edition of the M-1 Manual into evidence at trial. (See JX-23.)

M–1 Manual at 5. The M-1 Manual further explains that a utility using the utility-basis approach to establish its revenue requirements bases its calculation on "O&M expenses, depreciation expense, return on rate base, and taxes or other payments to the municipality's general fund." [4] Id. at 6. The M-1 Manual further notes that "[f]or a government-owned utility, the total level of annual revenue required may be similar under either the cash-needs approach or the utility approach." Id. at 7. The Special Master determined, and the parties do not dispute, "that Gannett Fleming and CWA used the utility-basis approach to calculate Artesian's revenue requirement in the 2007 Rate Study. (R&R at 31 (footnote omitted).)

CWA has maintained throughout this proceeding that the use of the term "cost-based" in Modified § 2.10 permitted it to use either the "cash-needs" approach or the "utility-basis" approach to calculate its revenue requirement as to Artesian. (R&R at 31.) Artesian, however, contends that the use of the term "cost-based" required CWA to use only the "cash-basis" approach and that CWA's use of the "utility-basis" approach breached the Agreement. (Id.) While the M-1 Manual explains the meaning of both the "cash-needs" and "utility" approaches to determining a utility's revenue requirements, both of those approaches are "cost-based." Consequently, the Special Master found that the record evidence of the trade usage of the term "cost-based" is not determinative of the meaning of that term as it was used in Modified § 2.10 of the Addendum. (Id. at 37.)

The Special Master next considered the parties' courses of performance under the Addendum prior to the 2007 Rate Study. He found "that Gannett Fleming and CWA used the utility-basis approach to establish Artesian's revenue requirement for each of the Rate Studies

---

[4]The M-1 Manual explains that there are two utility-basis approaches to water utility rate making, one is used for measuring a utility's revenue requirements and the other is used for allocating those revenue requirements among the classes of customers served by the water utility. M-1 Manual at 6.

issued between 1993 and 2007." (R&R at 42-43.) Neither of the parties has objected to this finding. The Special Master then looked at whether Gannett Fleming's and CWA's use of the utility-basis approach to calculate CWA's revenue requirements in the 1993-2007 Rate Studies established a course of performance pursuant to the version of the Pennsylvania Uniform Commercial Code ("UCC") that was in effect at the time the parties executed the Addendum.[5] (R&R at 48-56.) The Special Master found that, "[o]n their face, the Rate Studies do not explicitly state how Artesian's rates were set" (R&R at 50), and that "Artesian did not have knowledge of the nature of CWA's performance" as required to establish a course of performance for purposes of the Pennsylvania UCC (id. at 56). The Special Master determined, based on these findings, that the meaning of the term "cost-based" in Modified § 2.10 remained "ambiguous after considering both trade usage and course of performance." (Id.) Neither of the parties objects to this determination.

The Special Master next examined evidence concerning the pre-contract negotiations of the parties.[6] Two of the individuals who were directly involved in the negotiation of the Addendum, Spacht of Artesian and Mac Ewen of CWA, testified at trial regarding those negotiations. Spacht testified that he believed that the term "cost-based" in Modified § 2.10 of

---

[5]Between January 1, 1980 and June 16, 2008, the UCC provided that "[w]here the contract for sale involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, any course of performance accepted or acquiesced in without objection shall be relevant to determine the meaning of the agreement." 13 Pa. Cons. Stat. Ann. § 2208(a) (West 1999); see also 1979, Nov. 1, P.L. 255, No. 86, § 1 effective Jan. 1, 1980 (enacting this section); 2008, Apr. 16, P.L. 57, No. 13, § 4, effective June 16, 2008 (deleting this section).

[6]Under Pennsylvania law, if the intent of the parties to a contract remains unclear after the consideration of evidence of trade usage and the performance of the parties under the contract, "evidence concerning the pre-contract negotiations of the parties may . . . be considered in reaching a conclusion concerning the intention of the parties." AstenJohnson, Inc. v. Columbia Cas. Co., 562 F.3d 218, 220 (3d Cir. 2009) (citing Resolution Trust Corp. v. Urban Redev. Auth. of Pittsburgh, 638 A.2d 972, 975-76 (Pa. 1994)).

the Addendum required CWA to use the cash-needs approach to calculate its revenue requirements as to Artesian, because he believed that CWA had previously used the cash-needs approach:

> The cost base meant what they were doing, it was the cash-needs approach and what I understood most of the municipalities and government-run water operations to use. . . .
>
> So when I said cost-based, if you looked at the study, and we have the study before this was written, they used the cash-needs revenue-requirement approach. So when I said cost-based, it occurred to me that they were using the cash-needs approach. I called it the cash-basis approach. But I'll just call it cash needs.
>
> But the cash basis of accounting is how they came up with their revenue requirements. So that's what I understood they were using. That's why I wrote it that way. Why I said cost-based versus cash needs or cash basis, it was my understanding that they were using that.

(1/23/13 N.T. at 171-72.)

Mac Ewen does not presently recall his discussions with Spacht regarding the Addendum. (1/24/13 N.T. at 313-14.) However, he believes that he negotiated the Addendum with the assistance of Paul R. Herbert of Gannett Fleming. (Id. at 316-18, 325-26, 352.) He also believes that the final language of Modified § 2.10 of the Addendum was "intended only to memorialize and not to change the method that Gannett Fleming had been using to conduct rate studies for Chester Water Authority with respect to the rates charged Artesian Water Company prior to 1997." (Id. at 326-27.) Herbert also testified at the trial regarding his knowledge of the negotiations regarding the Addendum. Herbert was asked by Mac Ewan to review the draft addendum and comment on the proposed § 2.10. (2/25/13 N.T. at 816-17.) Herbert believes that the use of "cost-based" in Modified § 2.10 means that CWA's revenue requirements for Artesian's class of customers "would be determined under the utility basis of rate-making which

would include O and M expenses, operation and maintenance; depreciation expenses; and a return on their investment in rate base." (Id. at 817-18.)

Based on this evidence, the Special Master determined that "both parties intended that, pursuant to Modified Section 2.10 of the Addendum, CWA would continue to set Artesian's revenue requirement and rate as it had previously." (R&R at 59.) However, he further concluded that the parties each intended that CWA would establish its revenue requirement using a different methodology, i.e., Artesian intended CWA to use the "cash-needs" approach and CWA intended to continue using the "utility-basis" approach.[7] (Id. at 59-60.) He thus found, based on the evidence presented at trial, "that the parties intended Modified Section 2.10 to mean that CWA could establish Artesian's revenue requirement and its rates using *any* cost-based method − either the cash-needs approach or the utility-basis approach." (Id. at 60.) Based on this finding, the Special Master concluded that "[t]he simple fact that Gannett Fleming and CWA used the utility-basis revenue requirement to establish Artesian's rates does not constitute a breach of the Addendum." (Id. at 60-61.) He also concluded that, even though Artesian and CWA did not have the same understanding of the meaning of the term cost-based when they negotiated Modified § 2.10, the Addendum was not void for lack of a meeting of the minds. (Id. at 61.) He based this conclusion on the fact that "[t]he parties had over ten years of outward and

_____

[7]In reaching this conclusion, the Special Master determined that "Spacht was essentially laboring under a unilateral mistake -- he wrongly believed that Gannett Fleming had been using the cash-needs approach to establish Artesian's revenue requirement, but Gannett Fleming actually had been using the utility-basis approach." (R&R at 60.) Artesian objects to the Special Master's determination that Spacht had made a unilateral mistake in this regard. We did not consider the Special Master's statement in our de novo review of his determination that the Addendum is not void or our review of his recommendation that Gannett Fleming's and CWA's use of the utility-basis approach to establish CWA's revenue requirement with respect to Artesian's customer class in the 2007 Rate Study did not breach the Agreement. Consequently, we need not address whether this statement was in error.

objective manifestations of assent" to the language of the Addendum, namely, their performance under the Agreement for more than ten years after executing the Addendum.[8]  (R&R at 61.)

2.      Whether the Agreement is Void

Artesian objects to the Special Master's finding that the Addendum was not void even though the parties did not have the same understanding of the term "cost-based" as it was used in Modified § 2.10 when they entered into the Addendum.  "Under Pennsylvania law, to decide if a contract is enforceable, it must be determined '(1) whether both parties manifested an intention to be bound by the agreement; (2) whether the terms of the agreement are sufficiently definite to be enforced; and (3) whether there was consideration.'"  Reynolds v. Univ. of Pa., 483 F. App'x 726, 734 (3d Cir. 2012) (quoting ATACS Corp. v. Trans World Commc'ns, Inc., 155 F.3d 659, 666 (3d Cir. 1998)).  Both parties clearly manifested an intention to be bound by the Addendum, as both parties executed the Addendum on August 1, 1997.[9]  Moreover, neither party contends that the Addendum was not supported by consideration.  Consequently, we need only consider whether the terms of the Addendum are sufficiently definite to be enforced.

"[U]nder Pennsylvania law, the issue of whether the terms are sufficiently definite to be enforced is a question of law."  Reynolds, 483 F. App'x at 735 (citing Am. Eagle Outfitters v. Lyle & Scott Ltd., 584 F.3d 575, 585 (3d Cir. 2009)).  The parties do not argue that any terms of

---

[8]Artesian did not object to the rates it was being charged by CWA until April 16, 2010, when it "informed CWA that it believed the 2010 rate increase was inappropriate and that the 2008 and 2009 rate increases should be refunded."  (JSFF ¶ 127 (citation omitted); see also Pl.'s Obj. at 11 (stating that "in the ten years the parties operated under the Addendum prior to the disputed rate increases, Artesian did not object to the rate increases").)

[9]Artesian objects to the Special Master's finding that the parties had outwardly manifested their intent to be bound by the Addendum by performing under the Addendum for a period of ten years.  (R&R at 61.)  We are, however, reviewing the validity of the Addendum de novo, and are employing a different legal analysis than that employed by the Special Master.  As such, we need not, and do not, address this finding because it is immaterial to our independent, de novo analysis.

the Addendum, other than "cost-based" are ambiguous.  Indeed, with the exception of Modified § 2.10, the parties have been performing their obligations under the Agreement, including those terms added by the Addendum, without questioning the meaning of any of its terms since 1997. The Agreement clearly states the length of its term and how that term may be extended. (Addendum, Modified § 2.2.)  The Agreement also clearly states how much water Artesian is obligated to purchase from CWA and how much water CWA is obligated to supply to Artesian. (Id., Modified §§ 2.3, 2.4.)  The Agreement further clearly sets forth when the interconnection meter will be read and the manner in which CWA will bill Artesian for the water it purchases. (Id., Modified § 2.10.)  The Agreement also clearly sets forth how CWA will allocate its revenue requirements in calculating the rates it charges Artesian.  (Id.)

Nonetheless, Artesian argues that the term "cost-based" is sufficiently ambiguous that the entire Addendum cannot be enforced.  Artesian relies on Rich Maid Kitchens, Inc. v. Pennsylvania Lumbermens Mutual Insurance Company, 641 F. Supp. 297 (E.D. Pa. 1986), aff'd 833 F.2d 307 (3d Cir. 1987), for the proposition that, because the term "cost-based" is ambiguous, the parties never had a meeting of the minds as to that term and could not mutually assent to the contract.[10]  The Rich Maid Kitchens court noted that a contract may be ambiguous

---

[10]Artesian also relies on Henchen v. Renovo Services, LLC, Civ. A. No. 11-6073P, 2013 WL 1152040 (W.D.N.Y. Mar. 19, 2013), which states that, while an offer with ambiguous terms may be accepted, "courts have found that mutual assent is lacking where objective evidence exists that the parties ascribed different meanings to material terms of the offer prior to its acceptance."  Id. at *5.  However, the Henchen court further noted that the "'[u]nexpressed subjective views' of the parties' intent are not relevant to the question of mutual assent."  Id. (quoting O'Brien v. Argo Partners, Inc., 736 F. Supp. 2d 528, 534 (E.D.N.Y. 2010)).  The Third Circuit has also instructed courts not to consider a party's undisclosed subjective intent when deciding the intent of the parties.  Baldwin v. Univ. of Pittsburgh Med. Ctr., 636 F.3d 69, 75 (3d Cir. 2011) (quotation omitted).   As Artesian has pointed to no evidence that it informed CWA that it believed the term "cost-based" could only mean "cash-needs," its unexpressed subjective view of the meaning of that term is not relevant to the question of whether it manifested an intention to be bound by the Addendum.

16

if the parties "never had a meeting of the minds as to the exact term in conflict." 641 F. Supp. at 308. However, such an ambiguity does not result in a void contract. Id. Rather, "[w]hen the ambiguity prevents a meeting of the minds, . . . the court should apply the various rules of construction to decide which of the two possible meanings is appropriate." Id. As the Third Circuit has explained, "'[d]isputes over the meaning of a given phrase are common in contract disputes; the presence of such interpretative ambiguity, however, **does not go to whether the contract is enforceable**, but rather who (the judge or the jury) must decide what the given clause means.'" Reynolds, 483 F. App'x at 735 (emphasis added) (quoting Am. Eagle Outfitters, 584 F.3d at 585-86). The Agreement in this case "'covered all the necessary bases -- there are no undetermined matters -- and the agreement is not impossible to understand.'" Id. (quoting Am. Eagle Outfitters, 584 F.3d at 585). Consequently, we conclude that the existence of ambiguity with respect to the meaning of the term "cost-based" as that term is used in the Addendum does not render the Agreement void, it simply means that we must use the appropriate rules of construction to decide the appropriate meaning of that term in this case.

### 3.    The meaning of "cost-based"

"'The paramount goal of contract interpretation is to determine the intent of the parties.'" Baldwin v. Univ. of Pittsburgh Med. Ctr., 636 F.3d 69, 75 (3d Cir. 2011) (quoting Am. Eagle Outfitters, 584 F.3d at 587, and citing Mellon Bank, N.A. v. Aetna Bus. Credit, Inc., 619 F.2d 1001, 1009 (3d Cir. 1980).)  In deciding the intent of the parties, we "are to consider 'not the inner, subjective intent of the parties, but rather the intent a reasonable person would apprehend in considering the parties' behavior.'" Id. (quoting Am. Eagle Outfitters, 584 F.3d at 582, and citing Mellon Bank, 619 F.2d at 1009). As we mentioned above, the parties have not objected to the Special Master's determination that the term "cost-based" in Modified Section 2.10 could be

interpreted as CWA proposes, "to permit CWA to use any cost-based method to set Artesian's revenue requirement," or as Artesian proposes, to require CWA to "use the cash-needs approach to set Artesian's revenue requirement." (R&R at 37 (citing <u>Artesian Water Co.</u>, 2012 WL 3029689, at *9).) "If a contract term is found to be ambiguous," i.e., it may reasonably be understood to have more than one meaning, "the rule of *contra proferentem* generally requires the language to be construed against the drafter and in favor of the other party if the other party's interpretation is reasonable." <u>J.D. Eckman, Inc. v. Pa. Turnpike Comm'n</u>, No. 200 C.D. 2011, 2012 WL 8667896, at *9 (Pa. Commw. Ct. May 21, 2012) (citing <u>Dep't of Transp. v. Semanderes</u>, 531 A.2d 815, 818 (Pa. Cmmw. Ct. 1987)); <u>see also</u> <u>Shovel Transfer and Storage, Inc. v. Pa. Liquor Control Bd.</u>, 739 A.2d 133, 139 (Pa. 1999) (stating that "it is hornbook law that in determining the intent of the parties, ambiguities are to be construed against . . . the contract drafter" (citing <u>Cent. Transp., Inc. v. Bd. of Assessment Appeals of Cambria Cty.</u>, 417 A.2d 144, 149 (Pa. 1980)).

As we mentioned, <u>supra</u>, Artesian initially proposed the language for what would become Modified Section 2.10 of the Addendum in a fax sent by Spacht to Mac Ewen on June 6, 1997 that stated the following: "[t]he rates charged Artesian for wholesale or bulk water purchases shall be cost-based and shall rely on a cost-of-service analysis which conforms with water industry practice and standards." (JSFF ¶ 64 (citation omitted).) While Spacht testified at trial that he believed his use of the term "cost-based" in Modified § 2.10 would require CWA to use "the cash-needs approach" (1/23/13 N.T. at 170-71), there is no evidence on the record before us that his belief was ever communicated to CWA and we do not consider the "'inner, subjective intent of the parties'" in interpreting a contract. <u>Baldwin</u>, 636 F.3d at 75 (quoting <u>Am. Eagle Outiftters</u>, 584 F.3d at 582). Rather, the rules of construction require us to construe the language

of Modified § 2.10 against the party that drafted it, which in this case is Artesian. We conclude, therefore, that the term "cost-based," as it is used in Modified § 2.10 allowed CWA to use either the "cash-needs" or "utility-basis" approach to determining its revenue requirement with respect to Artesian. Therefore, we adopt the Special Master's recommendation that the Addendum was not void and that "Gannett Fleming's and CWA's use of the utility basis approach to establish the revenue requirement for Artesian's customer class in the 2007 Rate Study does not breach the Addendum." (R&R at 106.) We therefore overrule Artesian's objection to the Special Master's failure to find the Addendum to be void and his resulting recommendation that CWA did not breach the Addendum by utilizing the utility-basis approach to calculate its revenue requirements.

B.    CWA's 2009 and 2010 Rate Increases

Artesian and CWA both object to portions of the R&R with respect to whether CWA breached the Agreement in connection with its 2009 and 2010 Rate Increases. CWA objects to the Special Master's determination that its Board failed to comply with industry practice and standards in approving those rate increases. Artesian objects to the Special Master's determination that it is not entitled to damages in connection with the rate increases. Consequently we must determine (1) whether CWA violated its obligation to adhere to industry practice and standards in connection with its 2009 and 2010 rate increases, and (2) whether Artesian is entitled to damages as a result of the manner in which those rate increases were implemented.

1.    Water industry practices and standards

Artesian argued at trial that "CWA's Board violated industry practices and standards by implementing the rate increases proposed in the 2007 Rate Study without comparing the 2007

19

Rate Study's projections to CWA's actual performance, or considering whether those increases were actually necessary." (R&R at 74.) As we have mentioned previously, Modified § 2.10 of the Addendum provides that "[t]he rates charged Artesian for wholesale or bulk water purchases shall be cost-based and shall rely on a cost-of-service analysis using utility-basis of rate-making which conforms with water industry practice and standards." (Addendum, Modified § 2.10.)

The M-1 Manual provides that a utility "should review its projections at least annually to incorporate changed conditions." M-1 Manual at 3. The Special Master found that CWA's Board did not specifically consider whether the 2008, 2009 and 2010 rate increases were needed based on CWA's actual revenues. (R&R at 75-76.) The Special Master determined that it was not unreasonable for the Board to implement the July 2008 rate increase based on the 2007 Rate Study, since that rate study, which considered CWA's actual performance, had been performed only a few months before the rate increase was approved.[11] (Id. at 76-77.) However, the Special Master further determined that there was no evidence that CWA's Board had ever considered whether the 2009 and 2010 rate increases were necessary based on CWA's actual performance and that CWA's approval of those rate increases thus failed to comply with industry practices and standards. (Id. at 76.)

CWA objects to the Special Master's determination that CWA's Board, rather than an employee or officer of CWA, had the responsibility, pursuant to industry practices and standards, to annually review its projections to incorporate changed conditions. However, CWA points to no evidence that employees or officers of CWA, rather than its Board, were tasked with the responsibility to annually review its projections to incorporate changed conditions. Moreover,

---

[11]Artesian was notified of the 2008 rate increase in February, 2008, only two months after the December 2007 Rate Study was completed. (See JSFF ¶ 93 (citations omitted).)

CWA has not pointed to any evidence that any employee or officer of CWA actually performed an annual review of its projections to incorporate changed conditions.

The parties have stipulated to the following facts. "CWA is governed by the [Pennsylvania Municipal Authorities] Act and a Board of Directors . . . ." (JSFF ¶ 9 (citation omitted).) CWA's "Board is responsible for setting policies for CWA and assessing whether recommendations fit within those policies." (Id. ¶ 11 (citation omitted).) "The Board is also responsible for approving any and all rate increases charged to CWA's customers including Artesian." (Id. ¶ 12 (citations omitted).) CWA's Rate Studies are "developed from projections and budgets prepared by CWA's internal departments and approved by CWA's board of directors" (id. 14 (citation omitted)), and "Gannett Fleming recommends the rates that CWA should charge its customers in the form of a rate study, and those recommendations are presented to the Board for approval" (id. ¶ 15). The evidence thus establishes that CWA's Board had the responsibility both to approve the projections and budgets that supported all of CWA's rate increases and to approve all rate increases that Gannett Fleming recommended in the rate studies. We find, therefore, that CWA's Board had the responsibility, pursuant to industry practices and standards, to annually review its projections to incorporate changed conditions prior to approving rate increases based on those projections. CWA's objection to the Special Master's determination that CWA's Board, rather than an employee or officer of CWA, had such responsibility is, therefore, overruled.

### 2. Implementation of the 2009 and 2010 Rate Increases

Artesian argues that the Special Master erred by failing to award it damages even though he found that CWA failed to comply with industry practices and standards in implementing the 2009 and 2010 rate increases. Artesian relies on the Special Master's finding that CWA's Board

had not reviewed its projections in light of the following financial results prior to approving the 2009 and 2010 rate increases: (1) CWA "had a net recovery of $9,477,560 above its projected operating revenues, operating expenses, and capital expenditures in 2008, 2009 and 2010;" (2) nearly 80% of that amount ($7,489,423) was recovered by CWA in 2008; and (3) nearly 70% ($6,456,325) "resulted solely due to the difference between projected and actual capital expenditures in 2008." (R&R at 84.)

The Special Master determined that CWA's Board did not comply with industry practices and standards when it failed to ensure that the 2009 and 2010 rate increases were actually necessary in light of CWA's $9,477,560 net recovery above projections. (Id. at 85.) However, he concluded that the trial evidence was insufficient to establish that the Board's failure to comply with this duty resulted in the imposition of unnecessary rate increases, thereby breaching the Agreement. (Id. at 87.) Specifically, the Special Master explained that there is no evidence in the record regarding three critical issues: (1) whether the $7,489,423 recovered by CWA in 2008 in excess of its projections "was a large enough divergence from CWA's projections to mandate some action by the Board;" (2) the action that CWA's Board should have taken assuming that the $7,489,423 recovered by CWA in 2008 in excess of its projections was large enough to require action by the Board; and (3) whether the Board believed that the $6,456,325 difference between projected and actual capital expenditures in 2008 resulted from a delay in capital expenditures that would take place the next year and was, therefore, necessary capital for the next year. (R&R at 85-87.) The Special Master concluded that without evidence with respect to these issues he could not "determine whether the CWA Board's failure to consider whether its 2009 and 2010 rate increases were necessary actually led to the imposition of an unnecessary rate increase." (R&R at 87.)

Artesian objects to this conclusion on the ground that the evidence that the Special Master found lacking was not critical to the determination of whether Artesian should be awarded damages as a result of CWA's implementation of the 2009 and 2010 rate increases.[12] Artesian maintains that the Special Master's finding that CWA's Board failed to ensure that the 2009 and 2010 rate increases were necessary in light of CWA's actual revenues is, by itself, sufficient to establish that CWA breached the agreement by failing to comply with the requirement, in Modified § 2.10 of the Addendum, that it conform to water industry practice and standards. Consequently, Artesian contends that the rate increases violate the terms of the Addendum and it should only be required to pay CWA the last rate that was properly imposed

---

[12]Artesian also argues that CWA improperly denied the existence of a "Capital Fund" at trial. The Special Master did not mention a "Capital Fund" in the R&R and the "Capital Fund" does not appear to have played any part in his determination of Artesian's breach of contract claim. Consequently, the question of whether CWA improperly denied the existence of a "Capital Fund" is of no relevance to our determination of Artesian's objections to the R&R, and we will not address this issue any further.

Artesian also argues that the Special Master improperly denied its claim for damages in this case because he believed that granting Artesian the relief it sought, i.e., rolling back CWA's 2009 water rates to 2007 levels, would result in a $11.2 million reduction in CWA's revenues, which is more than CWA's net recovery above projections in 2008, 2009 and 2010. The Special Master, however, only noted in footnote 362 that "[i]f CWA had reduced its rates to 2007 levels as of January 1, 2009, its 2009-2010 actual operating revenues would have been ***$11,295,217 less*** than the projections set forth in the 2007 Rate Study." (R&R at 86 n.362.) The Special Master did not state that this fact played any part in his conclusion that CWA did not breach the Agreement by setting Artesian's water rates in 2008, 2009 and 2010. In fact, we reiterate that the Special Master's conclusion that CWA did not breach the Agreement in this regard was based on Artesian's failure to supply evidence with respect to the three critical issues listed above. Footnote 362 of the R&R is therefore dicta. See In re McDonald, 205 F.3d 606, 612 (3d Cir. 2000) (noting that dicta is defined as "'a statement in a judicial opinion that could have been deleted without seriously impairing the analytical foundations of the holding -- that, being peripheral, may not have received the full and careful consideration of the court that uttered it.'" (quoting Sarnoff v. American Home Prods. Corp., 798 F.2d 1075, 1084 (7th Cir. 1986))). Consequently, to the extent that Artesian's argument with respect to footnote 362 may be considered an objection to the R&R, we need not resolve that objection. See Drelles v. Metropolitan Life Ins. Co., 357 F.3d 344, 348 (3d Cir. 2003) (explaining that a comment in an opinion that is clearly dicta as that term is defined by In re McDonald is not a finding of fact and is not subject to review).

under the Addendum, which it claims is the rate in effect in 2007. Artesian claims that its damages are the difference between the amount it paid CWA for water based on the rate it was charged as a result of the 2008 and 2009 rate increases, and the amount it would have paid for that water at the 2007 rates. Artesian submits that, pursuant to this formula, its damages are $714,014.

Before we can determine whether Artesian is entitled to its claimed $714,014 in damages, we must determine whether Artesian established a breach of contract under Pennsylvania law based on CWA's failure to comply with industry practices and standards in connection with its approval of the 2009 and 2010 rate increases. The elements of a claim for breach of contract under Pennsylvania law are: "(1) the existence of a contract, (2) a breach of the duty imposed by the contract and (3) damages resulting from the breach." Sewer Auth. of City of Scranton v. Pa. Infrastructure Inv. Auth., 81 A.3d 1031, 1041-42 (Pa. Commw. Ct. 2013) (citing Orbisonia-Rockhill Joint Mun. Auth. v. Cromwell Twp., 978 A.2d 425, 428 (Pa. Cmmw. Ct. 2009)). Here, Artesian has established the existence of a contract, i.e., the Agreement, and the violation of a duty imposed by the contract, i.e., the duty to conform to water industry practice and standards in setting the rates Artesian was obligated to pay for the water it purchased from CWA. However, in order to prevail on a breach of contract claim based on this violation, Artesian also has to prove that it suffered damages resulting from the breach. See ATACS Corp. v. Trans World Commc'ns, Inc., 155 F.3d 659, 669 (3d Cir. 1998) (citations omitted). To do so, Artesian must establish, by a preponderance of the evidence, that CWA's Board would not have approved the 2009 and 2010 rate increases after it learned that CWA had a

net recovery of $7,489,423 above its projected operating revenues, operating expenses, and capital expenditures in 2008."[13]

There is, however, no evidence on the record that would establish what action CWA's Board would have taken had it compared the projections included in the 2007 Rate Study with CWA's actual results when it considered whether to implement the 2009 and 2010 rate increases. Indeed, as we noted supra, the Special Master identified three critical factual issues regarding damages for which evidence is lacking. (See R&R at 85-87.) Under these circumstances, we conclude that Artesian has failed to satisfy its burden of proving by a preponderance of the evidence that CWA's Board would not have implemented the 2009 and 2010 rate increases had they compared CWA's actual results to the projections in the 2007 Rate Study. Artesian has thus failed to prove by a preponderance of the evidence that it was damaged by CWA's Board's failure to compare the projections in the 2007 Rate Study with CWA's actual results before approving the 2009 and 2010 rate increases. Accordingly, we also conclude that Artesian has failed to prove the third element of this breach of contract claim by a preponderance of the evidence. Artesian's objection to the Special Master's determination that it did not prove a breach of contract under Pennsylvania law and that it is not entitled to damages as a result of the manner in which CWA implemented the 2009 and 2010 rate increases is, therefore, overruled.

C.    CWA's Entitlement to Late Fees as Part of its Damages

After reaching his conclusion that Artesian had not established a breach of contract in connection with CWA's 2008, 2009 and 2010 rate increases, the Special Master determined that

---

[13]"[T]he party alleging a breach of contract bears the burden of proving the elements of a breach of contract," Bohler-Uddelholm Am., 247 F.3d at 102, and "must establish [those elements] by a preponderance of the evidence" Food Team Intern'l, Ltd. v. Unilink, LLC, 2013 WL 5476582, at *10 (E.D. Pa. Sept. 30, 2013) (citing Bohler-Uddelholm Am., 247 F.3d at 102; 23 Williston on Contracts § 63:14 (4th ed. 2013)).

Artesian itself breached the Agreement beginning in July 2010, by refusing to pay CWA for the water it purchased in accordance with the rates in effect at that time and, instead, paying for that water in accordance with the rates that were in effect on July 1, 2007. (See R&R at 90; JX-16.) The Special Master recommended that:

> CWA has proven by a preponderance of the evidence that Artesian breached the [Agreement] by refusing to pay rates in excess of CWA's 2007 rates from July 1, 2010 to the present. Artesian must pay CWA for all withholding of invoiced amounts between July 2010 and the present, as well as late fees on those withheld amounts. From July 1, 2010 through the end of 2012, Artesian withheld $1,741,173.17, and CWA's damages as a result of this breach continue to accrue monthly.

(R&R at 106.) Artesian objects to both the Special Master's recommendation that CWA is entitled to damages of the amounts withheld by Artesian and the Special Master's recommendation that CWA is entitled to late fees on those withheld amounts.

With respect to the recommendation that CWA is entitled to damages as a result of Artesian's breach of the Agreement, Artesian objects on the ground that CWA breached the Agreement first, by setting its 2010 rates in violation of industry practices and standards. Since we have determined that Artesian did not satisfy its burden of proving its breach of contract claim grounded on CWA's approval of the 2010 rate increase, we overrule this objection.[14]

Artesian also objects to the Special Master's recommendation that CWA is entitled to a 10% late fee on the amounts withheld by Artesian. The Special Master based his recommendation that Artesian be assessed a late fee on the testimony of Russell Williams, Executive Manager and Chief Engineer of CWA, that CWA typically charges a 10% late fee on

---

[14]Artesian also argues that CWA's damages should be limited to those in excess of the damages that CWA caused to Artesian by improperly approving the 2010 rate increase. To the extent that this argument constitutes a separate objection to the Report and Recommendation, it is overruled, because Artesian did not succeed on its breach of contract claim based on CWA's approval of the 2010 rate increase.

disputed amounts after the dispute has been resolved. (R&R at 91 n.371 (citation omitted); 2/25/13 N.T. at 698-99, 708.)   Artesian argues that CWA is not entitled to a late fee on amounts not timely paid because the Agreement does not provide for such a fee.[15]   CWA does not claim that the Agreement itself provides for the imposition of a late fee.   Rather, CWA argues that Pennsylvania law provides for the imposition of a late fee in this case.

CWA relies on § 2-207 of Pennsylvania's Uniform Commercial Code, which provides for additional or different terms to be added to contracts as follows:

> **(a) General rule**.--A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms.

> **(b) Effect on contract**.--The additional terms are to be construed as proposals for addition to the contract. Between merchants such terms become part of the contract unless:

> (1) the offer expressly limits acceptance to the terms of the offer;

> (2) they materially alter it; or

> (3) notification of objection to them has already been given or is given within a reasonable time after notice of them is received.

13 Pa. Cons. Stat. Ann. § 2207.   Invoices sent with or after the delivery of goods have been found to "fall[] within the scope of § 2-207."   Herzog Oil Field Serv., Inc. v. Otto Torpedo Co., 570 A.2d 549, 550-51 (Pa. Super. Ct. 1990).   CWA thus contends that the invoices that it sent to Artesian, which CWA asserts contained information regarding its 10% late fee policy, added that late fee policy as a binding term of the Agreement.   However, Mr. Williams's testimony is the

---

[15]Artesian also objects to the Special Master's recommendation that it should be required to pay a 10% late fee on the ground that CWA did not notify Artesian that it would charge a late fee until shortly before trial.  As we sustain Artesian's objection to the late fee on other grounds, we do not reach this aspect of its objection.

only evidence on the record before us regarding the existence of CWA's late fee policy. Indeed, none of the invoices that CWA sent to Artesian are part of the record before us, and, as noted above, the Agreement itself does not provide for the imposition of a 10% late fee on amounts owed to CWA following resolution of a dispute. We therefore conclude, accordingly, that CWA has not satisfied its burden of establishing its entitlement to a 10% late fee on the amounts withheld by Artesian. Artesian's objection to the Special Master's recommendation that it be ordered to pay a 10% late fee on the amounts it withheld from CWA between July 1, 2010 and the present is, accordingly, sustained.

## IV. CWA'S OBJECTIONS

CWA objects to the Special Master's conclusion that an 11% return on equity ("ROE") used in the 2007 Rate Study was excessive and to the Special Master's seventh Recommendation, that we deny CWA's Motion for Sanctions.[16]

### A. The 11% Return on Equity

Artesian claimed at trial that CWA's use of an 11% ROE to calculate its revenue requirements in the 2007 Rate Study was excessive and, as a result of that and other alleged errors, CWA's overall revenue requirement in the 2007 Rate Study was overstated by approximately $14,000,000. (R&R at 65.) The Special Master considered the expert testimony presented by both parties and determined that the 11% ROE used by Gannett Fleming in the 2007 Rate Study was excessive and that use of an 8% ROE would have been more reasonable. (R&R at 70.) The Special Master further found that there were other errors in the 2007 Rate Study and that the net effect of all of the errors actually <u>increased</u> the utility-basis revenue

---

[16]We resolved, <u>supra</u>, CWA's third objection, i.e., to the Special Master's determination that CWA's Board had the responsibility, pursuant to industry practice and standards, to annually review its projections to incorporate changed conditions

requirement for Artesian's class by approximately $400,000. (<u>Id.</u> at 70-73.) The Special Master concluded, as a result, that the rates that CWA charged Artesian pursuant to the 2007 Rate Study "were substantially less than the utility-basis revenue requirement for Artesian's customer class" and did not violate industry standards. (<u>Id.</u> at 74.) Neither party has objected to the Special Master's conclusion that CWA's use of an 11% ROE in the 2007 Rate Study did not, in itself, result in rates charged to Artesian that violated industry standards. Consequently, we review only whether the 11% ROE used in the 2007 Rate Study was excessive.

CWA objects to the Special Master's conclusion that the 11% ROE was excessive on the ground that this conclusion is not supported by the record. The M-1 Manual explains that "[t]he return component is intended to pay the annual interest cost of debt capital and provide a fair rate of return for the total equity capital employed to finance facilities used to provide water service." M-1 Manual at 7. When a utility determines its annual revenue requirements, its ROE "should be in keeping with the return in other enterprises having corresponding risks" and "should be sufficient to assure confidence in the financial integrity of the enterprise so as to maintain its credit and to attract and hold capital." <u>Id.</u> Herbert testified at trial that government-owned utilities serving outside customers and investor-owned utilities should receive similar ROEs because the differences in risk "between a government-owned water utility serving outside customers and an investor-owned utility serving . . . non-owner customers is very small." (2/27/13 N.T. at 1153.) That is, because both types of utilities "have very similar operating characteristics, needs for capital, the same types of customers, the same risks of serving those types of customers, the same risks with collecting revenues that are owed to them and so on." (<u>Id.</u> at 1153.) He also testified that he participated in six water utility rate cases in the late 2006 and 2007 time frame and, in those cases, the utilities requested ROEs between 10.5% and 11.7%.

(Id. at 1157.)  Based on that experience, he concluded that an 11% ROE was consistent with industry standards in 2007.  (Id. at 1157-58.)

Guastella testified at trial that investor-owned utilities have higher risks than government-owned utilities and, therefore, government-owned utilities need a lower rate of return to attract capital.  (1/25/13 N.T. at 573-74.)  Guastella opined that the 11% ROE that Gannett Fleming used in CWA's 2007 Rate Study was, therefore, excessive.  (Id. at 574.)  In his view, an 8% ROE would provide a government-owned utility with "a sufficient level of return above its debt cost for the purposes of doing a utility-basis revenue requirement."  (Id.)  Guastella also testified that he could not compare the ROE used by CWA with other municipal utilities because government-owned utilities usually finance most "of their major capital improvements with debt financings."  (Id. at 575-76.)  Guastella opined that 8% would be a reasonable ROE for CWA because it is approximately twice CWA's cost of debt, which was 4.3%.  (Id. at 576-77.)  Guastella explained that he selected 8% because "this is really a measure of allocating costs to outside customers so that the outside customers pay a little more than the inside customers.  In my judgment, doubling the debt rate for that kind of equity allowance, which is a hypothetical calculation, is reasonable."  (Id. at 577.)

Artesian, as the Plaintiff in this action, has the burden of proving, by a preponderance of the evidence, that CWA's use of an 11% ROE to calculate its revenue requirement for Artesian in the 2007 Rate Study breached the Agreement because it did not conform to water industry practice and standards.  See Bohler-Uddelholm, 247 F.3d at 102.  The M-1 Manual, which both parties cite as a source of water industry practices and standards, provides that a water utility should calculate its revenue requirements using an ROE that is similar to the ROE used by "other enterprises having corresponding risks" and that is "sufficient to assure confidence in the

30

financial integrity of the enterprise so as to maintain its credit and to attract and hold capital." M-1 Manual at 7.  It is true that a government-owned water utility is different from a private investor-owned utility in that municipal water utilities "do not have 'equity' investors that require a 'return.'"  City of Lancaster v. Pa. Pub. Util. Comm'n, 769 A.2d 567, 573 (Pa. Commw. Ct. 2001).  However, Artesian has pointed to no record evidence that enterprises with risks similar to CWA's utilized 8% ROEs during the relevant time period.  Moreover, Guastella provided no support for his opinion that an 8% ROE would be sufficient for CWA except for his unsupported belief that doubling CWA's debt rate would be a reasonable hypothetical calculation.[17]  Artesian has pointed to no other evidence that would establish that an 8% ROE would be "sufficient to assure confidence in" CWA's financial integrity so that it can "maintain its credit and attract capital."  M-1 Manual at 7.  We conclude that Artesian has failed to satisfy its burden of proving, by a preponderance of the evidence, that Gannett Fleming's use of an 11% ROE to calculate CWA's revenue requirements in the 2007 Rate Study breached the Agreement because it failed to conform with industry standards and practices.  CWA's objection to the Special Master's conclusions that CWA's 11% ROE was excessive is, therefore, sustained.

B.    The Motion for Sanctions

On March 22, 2013, after the trial in this action concluded, CWA filed a Motion for Sanctions against Artesian pursuant to the court's inherent authority, and for sanctions against Artesian's counsel pursuant to 28 U.S.C. § 1927, this Court's Local Rule 83.6.1, and the court's inherent authority.  CWA seeks sanctions on the ground that Artesian's counsel made a false statement of material fact regarding Artesian's receipt of pre-2007 Rate Studies during the December 15, 2011 Hearing on CWA's Motion for Summary Judgment and failed to correct that

---

[17]As the Special Master noted, "Guastella [did] not even attempt to link his proposed 8% ROE to CWA's risk profile."  (R&R at 69.)

statement when Artesian learned that it was false. CWA objects to the Special Master's recommendation that we deny CWA's Motion for Sanctions against Artesian and its counsel. (R&R at 107.)

The facts giving rise to the Motion for Sanctions are as follows. CWA argued, in support of its Motion for Summary Judgment regarding the meaning of the term cost-based in Modified § 2.10 of the Addendum, that the parties' courses of performance established that the term cost-based referred to the utility-basis approach to calculating a water utility's revenue requirement. CWA specifically contended that it used the utility-basis approach both prior to and after the execution of the 1997 Addendum. In our Memorandum denying the Motion, we noted that the record evidence established that "Gannett Fleming consistently used the utility-basis approach to calculate CWA's revenue requirements as to Artesian." Artesian, 2012 WL 3029689, at *10. However, we also found that the evidence "[did] not establish that Artesian was aware that Gannett Fleming was continuing to use the utility-basis approach after the parties agreed to the Addendum and prior to its receipt of the 2007 Rate Study." Id. We based our finding on a representation made by Artesian's counsel during the December 2011 Hearing that CWA had not provided Artesian with its rate studies after 1996 and prior to the 2007 Rate Study." Id. (citing 12/15/11 Hr'g Tr. at 23)). Counsel for Artesian specifically stated the following during the Hearing:

> This is not a public document, Your Honor. They don't do the rate study and then deliver it to their customers. And there's [sic] no hearings before a Public Utility Commission. So the first time that they got this rate study that's the subject of this litigation was when they refused to pay their rate and asked for the rate study. They are not part of the process. Artesian isn't consulted. They don't send a letter saying you know, we're using the utility basis.

(12/15/11 Hr'g Tr. at 23.) The parties agree that we also specifically asked counsel for Artesian whether CWA had provided Artesian with copies of any if its rate studies that were completed

prior to 2007. Artesian's counsel checked with Spacht, who was sitting in the courtroom, and responded that CWA had not provided Artesian with copies of any of those rate studies. (See Def.'s Mem. in Support of its Exceptions at 6-7; Pl.'s Mem. in Response to CWA's Exceptions at 10-11.) Neither our question to counsel nor counsel's response were recorded or included in the transcript of the Hearing. While we did not rely on counsel's response in our July 24, 2012 Memorandum, his response supported the statement that is quoted above.

CWA subsequently identified, from documents produced by Artesian in discovery, letters that it sent to Spacht on September 18, 2002 and February 22, 2005, enclosing CWA's Rate Studies. CWA submitted copies of those letters to the Court on August 21 and September 7, 2012, and they are part of the record of this action. (See Docket No. 65, Exs. 1A, 3; Docket No. 76, Exs. 3, 5.) In spite of CWA's submission of this evidence, which indicated that Artesian had received at least two of CWA's rate studies at the time they were completed, Artesian failed to correct its counsel's December 15, 2011 misstatement of fact to the Court.[18] Artesian did, however, admit at trial that it received copies of all of the rate studies conducted for CWA between 1996 and 2007, when those studies were completed.[19]

The Special Master determined that, while counsel for Artesian should have corrected his misstatement, his failure to do so was not in bad faith and did not multiply the instant proceedings. (R&R at 102-05.) Based upon these determinations, the Special Master recommended that we deny the Motion for Sanctions as against counsel for Artesian. (Id. at 105,

_____

[18]CWA docketed those letters as exhibits to its Motions in Limine. Artesian did not initially admit that it had received the rate studies; rather, Artesian stated in its responses to CWA's in limine Motions that the letters "are merely cover letters purportedly enclosing water rate studies." (Docket No. 81 at 14 n.7.)

[19]Spacht specifically testified at trial that CWA conducted rate studies in 1999, 2002, 2005, and 2007 and that he received copies of all of those studies. (1/23/13 N.T. at 196.)

107.)  The Special Master further determined that Artesian itself did not do anything sanctionable and recommended that we also deny the Motion for Sanctions as to Artesian.  (Id. at 105, 107.)  CWA objects to the Special Master's determinations that Artesian and its counsel should not be sanctioned and his resulting recommendation that we deny the Motion for Sanctions.

          1.      <u>28 U.S.C. § 1927</u>

Section 1927 provides that:

> [a]ny attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

28 U.S.C. § 1927.  We may impose sanctions pursuant to § 1927 only against attorneys.  <u>In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions</u>, 278 F.3d 175, 187 n.7 (3d Cir. 2002) (citing <u>Williams v. Giant Eagle Markets, Inc.</u>, 883 F.2d 1184, 1191 (3d Cir. 1989)).  "[T]he principal purpose of imposing sanctions under 28 U.S.C. §1927 is the deterrence of intentional and unnecessary delay in the proceedings."  <u>Id.</u> at 188 (quoting <u>Zuk v. E. Pa. Psychiatric Inst.</u>, 103 F.3d 294, 297 (3d Cir. 1996)).  In order to impose sanctions against counsel for Artesian pursuant to § 1927, we must find that counsel "has (1) multiplied proceedings; (2) in an unreasonable and vexatious manner; (3) thereby increasing the cost of the proceedings; and (4) doing so in bad faith or by intentional misconduct."  <u>Id.</u> (citing <u>Williams</u>, 883 F.2d at 1191).  We cannot impose sanctions pursuant to § 1927 unless we "'find willful bad faith on the part of the offending attorney.'"  <u>Id.</u> (quoting <u>Zuk</u>, 103 F.3d at 297).  The Third Circuit has explained that the following are indications that counsel acted in bad faith:  "'the claims advanced were meritless, that counsel knew or should have known this, and that the motive for filing the suit

was for an improper purpose such as harassment.'" Id. (quoting Smith v. Detroit Fed'n Teachers Local 231, 829 F.2d 1370, 1375 (6th Cir. 1987)).  The Third Circuit has cautioned that we should exercise our power to sanction counsel pursuant to § 1927 "'only in instances of a serious and studied disregard for the orderly process of justice.'"  LaSalle Nat'l Bank v. First Conn. Holding Grp., LLC, 287 F.3d 279, 288-89 (3d Cir. 2002) (quoting Ford v. Temple Hosp., 790 F.2d 342, 347 (3d Cir. 1986)).

The parties do not dispute that counsel for Artesian made a misstatement when he informed us, on December 15, 2011, that CWA did not provide Artesian with copies of its rate studies between 1996 and 2007.  It is also undisputed that counsel for Artesian did not correct that misstatement prior to trial.  In order to determine whether counsel should be sanctioned pursuant to § 1927, we must first determine whether counsel's failure to correct that misstatement multiplied the proceedings in this action.  Prudential, 278 F.3d at 188.

As we mentioned, supra, the question of whether CWA provided Artesian with copies of its rate studies between 1996 and 2007 arose in connection with the issue of whether the parties' courses of performance shed light on the meaning of the term "cost-based" as that term is used in Modified § 2.10 of the Addendum.  On summary judgment, we rejected CWA's course of performance argument, which relied on an assertion that CWA had provided Artesian with copies of its rate studies between 1997 and 2007, observing that there was no evidence in the record that Artesian had received those studies, much less evidence that Artesian was aware that CWA's rate studies used the utility-basis approach to determine its revenue requirements as to Artesian.  See Artesian, 2012 WL 3029689, at *10.  After Spacht admitted at trial that Artesian had received those rate studies, CWA argued that:  (1) "Gannett Fleming used the utility-basis approach to determine CWA's revenue requirements as to Artesian's customer class in each rate

study issued between 1997 and 2007;" (2) Artesian received copies of each of those rate studies and, therefore, should have been aware that Gannett Fleming was using the utility-basis approach; and (3) "Artesian thus acquiesced to Gannett Fleming's method of calculation of the revenue requirement." (R&R at 38-39.)

In his analysis of this argument, the Special Master noted that "the Rate Studies are extremely difficult to interpret, and in no place explicitly state exactly how Gannett Fleming and CWA established the revenue requirement in setting rates for Artesian's customer class." (R&R at 48.) Since it is not obvious from the rate studies themselves that Gannett Fleming used the utility-basis approach to calculate CWA's revenue requirements with respect to customers in Artesian's class, we conclude that, even if Artesian had admitted that it received copies of the rate studies, the addition of that admission to the other evidence of the parties' courses of performance on the record of the Motion for Summary Judgment would not have been dispositive of the meaning of the term "cost-based" in Modified § 2.10. As a result, we further conclude that Artesian's failure to correct its misstatement, and to admit that it received CWA's rate studies when they were completed, did not multiply the proceedings in this case, as the meaning of the term "cost-based" would have been an issue at trial even if Artesian had corrected its misstatement. We conclude, accordingly, that the imposition of sanctions against Artesian's counsel pursuant to 28 U.S.C. § 1927 is not appropriate in this case.

### 2.   Local Rule 83.6.1

Local Rule of Civil Procedure 83.6.1 provides that an attorney who "so multipl[ies] the proceedings in a case as to increase unreasonably and vexatiously the costs thereof . . . may be disciplined as the court shall deem just." Local R. 83.6.1(b), (c). As we have concluded that Artesian's failure to correct its misstatement and admit that it received CWA's rate studies when

they were completed did not multiply the proceedings in this case, we conclude that the imposition of sanctions pursuant to Local Rule 83.6.1 is not appropriate.

### 3. The Court's inherent authority

The federal courts have the inherent power to discipline both the parties and the attorneys appearing before them. See Chambers v. NASCO, Inc., 501 U.S. 32, 45-46 (1991); Prudential, 278 F.3d at 189 (quoting Fellheimer, Eichen & Braverman, P.C. v. Charter Techs., Inc., 57 F.3d 1215, 1224 (3d Cir. 1995)). The Supreme Court has explained that "if a court finds 'that fraud has been practiced upon it, or that the very temple of justice has been defiled,' it may assess attorney's fees against the responsible party." Chambers, 501 U.S. at 46 (quoting Universal Oil Prods. Co. v. Root Refining Co., 328 U.S. 575, 580 (1946)). A court may also sanction a party when that party "'shows bad faith by delaying or disrupting the litigation or by hampering enforcement of a court order.'" Id. (quoting Hutto v. Finney, 437 U.S. 678, 689 n.14 (1978)). The Third Circuit has stated that the following circumstances may justify the imposition of sanctions pursuant to the court's inherent power:

> "cases where a party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons. . . . The imposition of sanctions in this instance transcends a court's equitable power concerning relations between the parties and reaches a court's inherent power to police itself, thus serving the dual purpose of vindicating judicial authority without resort to the more drastic sanctions available for contempt of court and making the prevailing party whole for expenses caused by his opponent's obstinacy.

Prudential, 278 F.3d at 189 (alteration in original) (quoting Fellheimer, 57 F.3d at 1224). The Third Circuit has also noted that "'[b]ecause of their very potency, inherent powers must be exercised with restraint and caution.'" Id. (alteration in original) (quoting Chambers, 501 U.S. at 44; and citing Eash v. Riggins Trucking, Inc., 757 F.2d 557, 562 (3d Cir. 1985) (en banc)).

It is clear that Spacht made a misrepresentation when he indicated to counsel on December 15, 2011 that Artesian had not received any rate studies from CWA between 1997 and 2007. However, there is no evidence on the record before us that the misrepresentation was knowing and intentional. CWA argues only that Artesian was complicit in its counsel's failure to correct that misstatement. There is no record evidence of this complicity. We therefore decline to use our inherent authority to impose sanctions as against Artesian.

Counsel for Artesian, however, had an affirmative obligation to correct the misstatement he made to the Court on December 15, 2011.[20] Rule 3.3 of the Pennsylvania Rules of Professional Conduct ("RPC") requires that "[a] lawyer shall not knowingly: (1) make a false statement of material fact or law to a tribunal or **fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer**."[21] RPC 3.3(a) (emphasis added). Artesian's lawyers admit that they were aware, no later than September 2012, that counsel's December 15, 2011 statement was incorrect. (<u>See</u> Schultz Aff. ¶ 8.) Yet, notwithstanding his obligation under RPC 3.3(a)(1), counsel failed to correct his misstatement. Artesian's lawyers maintain that counsel's failure to correct his misstatement was not in bad faith because he "believed (and still believes) that there was no need for counsel to 'notify' opposing counsel or the Court of his misrepresentation once CWA produced letters to Artesian (and to the Court)

---

[20]There is no evidence on the record that, at the time counsel for Artesian denied that Artesian had received copies of CWA's rate studies between 1997 and 2007, he was aware that statement was incorrect. We thus conclude that counsel for Artesian did not make a knowing misstatement.

[21]The United States District Court for the Eastern District of Pennsylvania has adopted the Pennsylvania Rules of Professional Conduct. Local R. Civ. P. 83.6, Rule IV B. Consequently, a violation of the Pennsylvania Rules of Professional Conduct constitutes misconduct in this court. <u>See id.</u> ("Acts or omissions by an attorney admitted to practice before the [Eastern District], . . . which violate the Rules of Professional Conduct adopted by this Court shall constitute misconduct and shall be grounds for discipline.").

showing that Artesian had, in fact, received copies of at least some of the rate studies prior to 2007." (Pl.'s Mem. in Response to CWA's Exceptions at 16.) RPC 3.3, however, does not contain an exception to a lawyer's affirmative obligation to correct his misstatement if the court has learned of the misstatement from another source. We conclude that counsel's failure to correct his December 15, 2011 misstatement may very well have violated RPC 3.3(a)(1). However, as we have also concluded that counsel's failure to correct the December 15, 2011 misstatement did not multiply the proceedings in this case, we decline to impose sanctions against counsel pursuant to our inherent authority. See Prudential, 278 F.3d at 189 (noting that "[b]ecause of their very potency, inherent powers must be exercised with restraint and caution." (alteration in original) (quotation and citation omitted)). We thus conclude that CWA's Motion for Sanctions should be denied in all respects and overrule CWA's objections to the Special Master's recommendation that we deny the Motion for Sanctions.

## V. CONCLUSION

For the reasons stated above, we overrule Artesian's objections to the Report and Recommendation with respect to the Special Master's (1) finding that the Addendum is not void even though the parties did not have the same understanding of the term "cost-based" as it was used in Modified § 2.10 of the Addendum; (2) determination that it is not entitled to damages as a result of the manner in which CWA implemented its 2009 and 2010 rate increases; and (3) recommendation that it be required to pay damages to CWA for failing to pay all of the invoiced amounts for water it purchased from CWA beginning on July 1, 2010. We sustain Artesian's objections to the Special Master's determination that CWA is entitled to the payment of late fees on the amounts Artesian withheld from its payments for the water it purchased from CWA beginning in July 2010.

We overrule CWA's exceptions to the Special Master's determination that CWA's Board had the responsibility, in accordance with water industry practice and standards, to annually review its projections to incorporate changed conditions. We also overrule CWA's exceptions to the Special Master's recommendation that we deny CWA's Motion for Sanctions. We sustain CWA's exceptions to the Special Master's conclusions that the 11% ROE that Gannett Fleming used to prepare CWA's rate studies was excessive. An appropriate order follows.

BY THE COURT:

_____
John R. Padova, J.